Bond & Murdock et al. *vs.* Zeigler et al.

55.—ELIZABETH WRIGHT, executrix of the last will and testament of JAMES. H WRIGHT, deceased, defendant in execution, and BOND and MURDOCK, claimants and plaintiffs in error, *vs.* WM. ZEIGLER, defendant in error.

The SAME *vs.* SIMON HENDERSON, defendant in error. ,

The SAME *vs.* DANIEL SMITH, defendant in error.

The questions, both of law and fact, involved in the above three cases, being precisely the same, they were, by consent of parties, consolidated, and tried *together* as one case.

An executor under a will authorizing the sale of property of the testator to pay debts, but without specifying the manner of sale, may dispose of slaves of testator at *private sale*, and without any previous advertisement of such intended sale, or leave of the Court of Ordinary, and the purchaser at such *private sale* will acquire a good title, even as against the creditors of the testator ; provided that the purchase is *bona fide*, and without fraud on the part of the purchaser.

The purchaser, in such case, is not bound to see to the proper application of the purchase-money by the executor. " What becomes of the price, is of no concern to him." Nor is he required, before buying, to look into the accounts of the executor, to ascertain that he is faithfully administering his trust. The law presumes this in favor of the executor. But in all cases where the sale is infected with *fraud* and *covin* between the executor and purchaser, it is absolutely void, and the title to the property remains unchanged.

These were claim cases, tried before Judge Floyd in the Superior Court of the county of Crawford, at February Term, 1846. They were founded upon levies made upon certain slaves, as the property of the estate of James H. Wright, deceased, by virtue of executions against Elizabeth Wright, as executrix of the last will and testament of said deceased, founded upon debts of the testator. The slaves, so levied on, had been sold by said executrix to the claimants, who were creditors of said deceased, to the amount of half the purchase-money ; said sale having been made in May, 1842, before the judgments were rendered, and not at public outcry, and without notice of any kind.

Upon the trial of these causes in the court below, the counsel for the claimants offered, and read in evidence, the will of said deceased, which, among other provisions, contained the following items, to wit : " I wish the notes and accounts now in my hands, to be applied by my executors to the payment of my just debts ; and if those should not be sufficient for that purpose, then it is my will and desire that a sufficient portion of my estate, real or personal, as my representatives shall deem most advisable, be sold to pay my debts." It appeared that two of the executors named in the will refused to qualify, and that the executrix alone represented the estate. It also appeared that the notes and accounts were wholly insufficient to pay the debts of the testator. And it being held by the court that the contingency had happened, authorizing a sale of the property of the testator to pay his debts, the

counsel for the claimants offered in evidence their respective bills of sale for the property in dispute, from the said executrix, executed under the sale aforesaid.' To which the counsel for the plaintiffs in execution objected, on the ground that it appeared, from the testimony, that said sale had been made privately, and without the statutory notice, and without said property being exposed to public outcry and sale. Whereupon the court below sustained the objection, upon the ground that the executrix had no authority at private sale, and that no title could vest in the purchaser, except after advertisement and public sale ; and verdicts were thereupon rendered, finding the property subject, and the claimants excepted.

WASHINGTON POE, for the plaintiffs in error.

At common law, an executor has the entire and complete control and direction in relation to the assets of the testator. He may release, sell, or give away his goods, &c.—*Office of Ex.* 34. The goods of the testator are considered his, the executor's, from the death of the testator.—*Ib.* 35 ; 4 *Munford*, 196, *Monroe* vs. *Garnes.*

The executor derives all his title from the will.—*Toller*, 45. An executor may sell the property of his testator for his own debt, and if the purchaser buys *bona fide*, neither a specific legatee, heir nor creditor can pursue the property in the hands of such purchaser.—1 *Atkyns' R.* 463, *Nugent* vs. *Gifford*; 3 *Atkyns*, 235, *Mead* vs. *Ld. Orrery* ; 7 *Johns. Ch. Rep.* 150 ; 2 *Rand. Rep.* 294 ; 4 *Rand. Rep.* 576. The doctrine in *Nugent* vs. *Gifford* received the sanction of Lord Mansfield. —*Whale* vs. *Booth*, 4 *T. R.* 635.

The doctrine in *Nugent* vs. *Gifford*, sustained by Chancellor Kent.—7 *Johns. Ch. Rep.* 21, *Sutherland* vs. *Brush.*

The doctrine in *Nugent* vs. *Gifford*, sustained by Judge Story.—2 *Story's Eq.* sec. 1129.

Nor is it necessary for the purchaser to see to the application of the purchase money.—1 *Cox's Rep.* 145, *Bonury* vs. *Ridgard*; 2 *Dick. Rep.* 725, *Scott* vs. *Tyler* ; 2 *Story's Eq.* sec. 1128 ; 7 *Johns. Ch. Rep.* 150, 159.

A chancery guardian may in his discretion sell the personal property of his ward, for the purposes of his trust, without any previous order of the court, if the court would have directed the sale on application.— 7 *Johns. Ch. Rep.* 154, *Field* vs. *Schieffelin.*

But doubtless the defendants in error will rely upon the statute of Georgia of 1829, (*Prin. Dig.* 254, sec. 118,) authorizing the courts of ordinary to order sales of slaves belonging to testator's estates. In support of claimant's title, we hold, that the statute only applies to cases in which the testator omitted to order a sale in his will.—4 *Eq. Rep.* 522, 527, *Saxon and Wife* vs. *Barkesdale and Garrett.*

There is no other statute of Georgia requiring executors to expose the slaves of testators at public sale or to advertise such sales.

The fourth section of the statute of executors and administrators, is in reference to the sale of goods and chattels, which terms do not include *slaves*, but have always been held to apply exclusively to the perishable property of testators and intestates.

The forty-fourth section of same act, fixing the time of sales, refers alone to such sales as are ordered by the court of ordinary; and in respect to executors applies solely to the sale of land.—*Prin. Dig.* 234.

The forty-fifth section of said act applies to slaves held by administrators, and the omission of executors in that act, goes far to sustain the conclusion, that they had a discretion in the sale of such property.—*Ib.* The case of *Saxon and Wife* vs. *Barkesdale and Garrett,* (4 *Eq. Rep.* 527,) held that the statute of South Carolina was applicable, *because* there was no authority in the will to sell.

As far as circumstances will permit, a court of equity will supply any defect in the execution of a power given by a will, to executors to sell lands for payment of debts; so far as to protect a purchaser for a valuable consideration.—2 *Munf. Rep.* 129, *Roberts' widow and heirs* vs. *Staunton.*—See Judge Tucker and *Flemming's Opinions,* 134, 139.

And even if our law of executors and administrators contained a provision requiring a sale at public auction, yet the remedy for a violation would be against the executor, and not the purchaser, if there was no fraud in purchaser.—*Hudson and others* vs. *Hudson, admr.* 5 *Munf.* 181, 183.—See 3 *Munf.* 1, in which the case went off on a different point; but Mr. Wickham admitted the point for which we contend.

AMOS W. HAMMOND, for the defendants in error.

1st. This case is not governed by the statute or common law of England. Our colonial statute of 1764, (*Prin. Dig.* 223,) which regulates this subject, was passed twenty years before the adopting statute, (*Prin. Dig.* 570,) and therefore, although we admit that an executor in England or by the English law would have the unquestionable right to sell the property of the testator, without any notice by advertisement, or otherwise, and where and when he pleased, and to whom he pleased, yet that right has not existed in Georgia since February, 1764, because at that time our colonial Legislature passed the law requiring all *intended* sales by executors or administrators to be advertised, &c., &c.

2d. In no case by the laws of Georgia can an executor or administrator sell property of the testator or intestate without first obtaining an order for that purpose from the Court of Ordinary, unless by will a testator gives his executor such right by express words in his will; and that this power can be given to an executor by an *insolvent* testator, where such power would prejudice the rights of creditors, is, to say the least of it, very questionable; for a testator, if he can give such right, might authorize an irresponsible relation to sell his property in Alabama or Mississippi privately, and, giving no security for the faithful performance of his acts, might thus legally defeat the rights of creditors. The rule of law, *governing* the *time, place* and *manner* of sale, should therefore be followed by the executor.

Now, to ascertain whether the bill of sale, offered by claimants in the court below, was properly or improperly rejected, we must first look to the object of the law, requiring these sales to be *advertised* for sixty days, and then to be had at the court-house door, and on the first Tuesday in the month, and providing for continuing the sale from day to day by giving public notice of such intended continuance before four

o'clock of the afternoon of the first day of sale. 1st. The policy of this law was to have the sale under such circumstances as to make the property intended to be sold, bring the very highest price for the benefit of those concerned. 2d. That creditors of an insolvent estate might have an opportunity, if they wished to buy the property; that a fair competition amongst the bidders brought to the sale by the notice might be induced, and the estate consequently sell for more, and the creditors and heirs be thereby benefited.

But, suppose the court does not see any object, sufficient to have induced the Legislature to have made any notice, or other preliminary step necessary, still, if the statute requires any preliminary step to be taken, by the executor, before the sale, this court ought to decide, in the absence of proof, that this step was not taken by the executor, and the court did right to reject the bill of sale, which of course was illegal, unless the law, under which the sale was had, was first complied with.

May it please the court: What is the duty of an executor, upon taking upon himself the burthen of the execution of his testator's will? 1st. He is to be governed in all things by the will, so far as it speaks explicitly, unless it requires him to do something against, or to abstain from doing something required by, law. It is said the will is the law of the executor, but this is only true with this qualification, that whenever the testator expresses his will clearly, and this is not contrary to law, or conflicting with the rights of creditors, or others interested, then the *will* is the law of the executor, otherwise not. In other words: When the will requires an executor to do a particular thing, without specifying the *manner*, (as in this case,) then, whether the executor has the right to do that thing in a particular way, must entirely depend on the question whether the manner, selected by the executor, is regulated by law or not. If the *law be not silent* as to the *manner*, *time* and *place*, although the *power* to sell be ever so *clear*, still it is the duty of the executor to sell in the *manner*, and at the *time* and *place* prescribed by law. And if the law require a particular *time* and *place*, and a *particular manner* of sale; and the testator order a *sale* in a *different manner*, or at a different *time* or *place*, then the *law* must govern the executor, and not the *will*. Otherwise an insolvent debtor might order a sale, and legally *commit* a fraud, and waste an estate, without security to creditors, or means in their power to prevent it.

After probate of the will, and qualification of the executor, the creditors give notice of their demands, and, in cases of insolvency, look out for an order to sell the slaves, if any. They ask the executor, Do you intend to sell the negroes? In this case, he answers, The will requires me, first, to ascertain whether the notes and accounts will pay the debts, and, if not, then I will sell. Well, the executor finds the estate insolvent, and determines to sell the slaves. A lawyer advises the executor, If you *intend* to sell the slaves, you must get an order of the Court of Ordinary; but the executor says, I *have* the *power* given me to sell what I please, whenever I find a sale necessary, in order to pay the testator's debts. Then he is advised, If you have the power to sell, go on and do so. But the next inquiry is, How? To whom, where, and when shall I sell? Why, just as the testator directed you; for his will governs you, under your oath, and is your law. But the executor, on

looking to the will, finds that no direction is given as to the *time*, *place*, or *manner*. Then where does he go for instruction? To his own discretion, or the law? Will he sell privately, or endeavor, by a public sale, after due notice, sixty days, to get the best price that competition will produce? Will he sell at the court-house, in the county, publicly? Or will he take the negroes to the State of Alabama, or Mississippi, and sell privately? The law answers these questions.

My brother Poe read from 7 *Johns. Ch. Rep.* 154. This case only goes this far, that in case where the Court of Equity would have granted a right to sell in the first instance, if it had been applied to for leave, it would confirm what was done in that case, without leave first having been had and obtained, where confirming the thing done would not conflict with the law, or the rights of third persons. But if application had been made to the Court of Ordinary, for leave to sell the slaves of Wright *privately*, out of this State, in the country, or without any advertisement, *would that court—could* that court have granted any such leave to sell? My brother Poe says, that slaves are not such personal property as contemplated, in the statute of Georgia, from which he read. Can this position be true?

I will conclude by remarking, that the second position I laid down, I still believe to be correct, to wit: that in all cases of intended sales, by an executor or an administrator, the rules of law, governing the *manner*, *time* and *place*, *must be followed*, even though the testator point out a *mode*, *time* and *place*.

ANGUS M. D. KING, for the defendants in error, in conclusion.

The requirements of our statute (*Prince*, 223, 224) are not only explicit, but they are salutary; they require sales by executors and administrators to be publicly advertised for a length of time; to be had at the court-house of the proper county, on the first Tuesday of the month, and between the usual hours of sale: these are the most material. Here the testator is silent as to the *manner* of sale, by his representatives, as they are called in the will; and we must presume his intention to be, that the sale should take place according to the rules prescribed in the statute, which are notorious and familiar to every one. This, we contend, is the only reasonable construction to put upon the intention of the testator.

Here nothing of the sort was observed: a valuable estate has disappeared, and, except the parties to secret sales, no one can tell where, or how, or for what consideration the thing has been done. Not only have heirs and creditors a deep interest that the law should be enforced to the full extent of its spirit and meaning, but to its very letter; but we might add, that even the community in which a man has lived, have some right to know that his estate has not been squandered or embezzled. The good effect of the law is everywhere observable in the sale of estates, and there is no one of its requirements that should not be enforced to the full by the courts of the country.

SAMUEL HALL, in conclusion for the plaintiffs in error, after briefly stating the facts of the case, as presented by the record, argued as follows:

In the examination of the questions presented in this case, it will be necessary to inquire, in the first place, from what source the executor derives his authority?

2d. What were the executor's powers, at common law, over the assets of his testator?

3d. What are the rules which govern in the construction and execution of powers?

4th. How far the executor's powers at common law over the assets of his testator are modified by the acts of 1764 and 1829?

5th. How far a purchaser's title is to be affected by any irregularity in the sale, when the authority to sell is clear; and whether the court, in a suit with a stranger, will inquire collaterally into such irregularity?

This inquiry will lead to the following conclusions, which we shall here state as our grounds of exception to his Honor's opinion:

1st. The executor acts under, and derives his authority from, the will, and not from the Court of Ordinary.

2d. That at common law, the executor was in many respects, and for many purposes, to be considered by third persons as the absolute owner of his testator's personal estate. That he might dispose of legacies specifically bequeathed, and that the legatee or creditor could not follow the assets in the hands of the purchaser, without first showing collusion. That some cases hold, that he may sell, pledge, or mortgage assets in payment of his individual debt. That he may sell, pledge, or mortgage, for the purpose of paying his testator's debts, all the cases hold. That the power of sale was incident to the office of executor, and lastly, that the purchaser is not bound to see to the application of the purchase-money.

3d. That where power is conferred in general terms, without specifying any mode in which it is to be executed, and there is more than one mode of carrying it into effect, it is at the option of the donee which mode he will take.

4th. That the act of 1764 does not regulate the sale of slaves, and that the act of 1829 only modifies the executor's common law power over his testator's assets, so far as to take away from him the power of selling, which was incident to his office, and make it his duty, where the will is silent upon the subject, to apply to the Court of Ordinary for its order and direction, and that it is only such sales as the court must and does order, that the statutes require to be made at public auction, &c.

5th. That where the authority to sell is clear and unquestionable, the purchaser will not be affected by any irregularity in the sale; and in a suit with a stranger, the court will not permit such irregularity to be inquired into collaterally.

And first, that an executor acts under and derives his authority from the will, and not from the Court of Ordinary, is evidenced from the fact that he may (without incurring any of the consequences to which an executor *de son tort* is liable) perform many acts, before proving the will, and taking out testamentary letters, " such as making an inventory; taking possession of the testator's effects; taking security for debts due to the deceased; removing goods; paying and releasing debts owing from the estate; receiving and releasing debts owing to it; selling, giving away, and otherwise disposing of, the goods and chattels of the

testator; assenting to and paying legacies; commencing actions in testator's right; and indeed almost every act incident to his office; and this, too, as a consequence of the principle that his title is derived from the will, and takes effect the instant of the testator's death."—*Toller,* book 1, ch. 2, sec. 4.

But what is an executor? "An executor," says *Toller,* book 1, ch. 2, sec. 1, "is he to whom the execution of a last will and testament of personal estate is by the testator's appointment confided." From this definition it is clear that he is appointed to carry out the will. In the performance of his duty, then, he must look to the will; this is his guide, and this is his law; from this source, and this source alone, his authority is derived.

This view is greatly strengthened by our own statute, and the oath he is required to take; that oath obliges him (see *Prin. Dig.* 227) well and truly to execute the last will and testament of his testator, by paying, first the debts, and then the legacies, contained in said will, so far as the goods and chattels of the testator will thereunto extend, &c. Now, what was the executrix in this case sworn to do? Why, to execute her testator's will; and that will required her to apply the notes and accounts in the testator's hands at his death, to the payment of his debts; and if they were insufficient for that purpose, then she was obliged, by the solemn oath she had taken, to carry out his directions, and sell such of his estate as she might deem most advisable, for the payment of his debts; and under circumstances so solemn, and for the very purpose mentioned in this will, after the insufficiency of his notes and accounts was ascertained, three slaves, Venus, Jim, and Mariah, were sold to the plaintiffs in error. But her authority to sell at all is not questioned. His honor admits she had authority from the will to sell, but denies her right to sell in the manner she did. Now, the will does not require her to sell in any particular manner; and it follows, that if his honor is correct, there must be something in the common or statute law, directing the manner in which she shall sell under such circumstances. Let us in the first place see if his honor's authority is derived from the common law.

We have already said, that at common law an executor might sell or pledge legacies specifically bequeathed, and that such sale would confer a valid title upon the purchaser, and that where no collusion was shown, the court would not follow the assets into the hands of the purchaser. This view is supported by *Humble* vs. *Bill,* 2 *Vernon's Ch. Rep.* 444. These were the facts of that case : "Bill, having a term of twenty-one years in the printing-office, devised, (amongst other things,) that £2,000 should be raised out of the printing-office for his daughter, the wife of Darcy Savage, and their children; and made one Garrett executor, who first mortgaged the term to Dr. Brown, and the same was afterwards assigned to Sir William Humble for £1,800. Now, "it was insisted" (and this we beg the court to bear in mind) "that here was no occasion to sell to pay debts, and Sir William, having notice of the will, was to take the estate subject to the £2,000. But the court was of opinion, that the executor of a testamentary estate had the power over it, so as to alien or sell, as he should judge necessary, and that if he sold in prejudice of residuary or specific legatees, they might have their remedy

against the executor, but not follow the estate into the hands of the purchaser ; for, should that be allowed, no one would venture to buy of an executor, for it would be unreasonable that a purchaser should take upon him to make out the *quantum* of the *debts* or *assets*, nor is he entitled to have the *vouchers* to make out such an *account ;* and if such difficulties be put upon purchasers of chattels, &c., from executors, it will follow that executors will be under an incapacity, and disabled to sell, though there be never so much occasion for it to pay debts ; and the court decreed an account to the plaintiff, ( *Sir William Humble,*) of the rents and profits, and to hold and enjoy the printing-office, and the defendants to redeem or be foreclosed." *En passant,* it may be remarked that this case makes the executor the entire judge of the necessity for a sale, and does not even make it incumbent upon the purchaser to inquire into the necessity ; indeed, it seems to hold such a thing altogether improper, and this, too, it must be remembered, in a case where the purchaser was charged with knowledge of the fact that the property was taking a direction contrary to that given it by the testator himself.

Although this decree was reversed upon appeal to the House of Lords, it was subsequently set up in *Ewer* vs. *Corbet,* 2 P Williams' *Rep.* 148. In this last case, after noticing the reversal of *Humble* vs. *Bill,* the Master of the Rolls proceeds : " But since that time, I take it to have been resolved, and with great reason, that an executor, where there are debts, may sell a term, and the devisee of the term has no other remedy but against the executor to recover the value thereof, if there be sufficient assets for the payment of debts." So far, this case decides that the devisee has a remedy only against the executor, and that this remedy depends upon the sufficiency of the assets to pay debts ; if they are sufficient, the devisee has his remedy, not against the purchaser, but against the executor ; if they are insufficient, he has no remedy, either against the purchaser or executor.

But, again : this case decides " that it is not reasonable to put every purchaser of a lease from an executor to take account of the testator's debts ; nor has he any means to discover them." " On the contrary, as the whole personal estate of the testator is liable to the debts, his lease must (*inter alia*) of necessity be liable, and therefore may be sold by the executor." From this it is most apparent, that it is not to be presumed that the purchaser had notice that there were no debts ; and the burden of proving this fact is not upon him, but upon the devisee ; and the devisee must also prove other circumstances, going to impeach the fairness and honesty of the transaction. The Master of the Rolls admits, in this case, if an executor should sell a term for an under value, or to one who has notice that there are no debts, or that all the debts are paid, that this might be another consideration. This case, then, does not decide that such circumstances would avoid the sale, and vacate the purchaser's title ; there were no such ingredients in the case, and a decision of the point was unnecessary.

In *Burting* vs. *Stonard,* (2 *P. Wms.* 150,) a sale of a residuary or general legacy was sustained ; and the decision in *Ewer* vs. *Corbet* affirmed.

Mr. Justice Story (2 *Com. Eq. Juris.* §§ 1128, 1129, 1130) reviews these decisions, and approves of them.

` We shall, however, have occasion to examine this last authority more particularly when we come to speak of the obligation of the purchaser to see to the application of the purchase-money. In the mean time, we shall endeavor to show, as we have asserted, that some cases hold, that the executor may assign, pledge, mortgage, or sell, in payment of his own debts; and that such assignment, pledge, mortgage, or sale, will confer a good title upon the assignee, mortgagee, pledgee, or purchaser, where a contrivance to commit a *devastavit* is not shown.

We shall merely refer to these authorities by name, and recite their substance, reserving the right, if need be, to read them to the court.

In *Nugent* vs. *Gifford*, (1 *Atkyns*, 463,) it is decided, that where an executor assigns over a mortgage term of his testator to A, as a satisfaction of a debt due to A from the executor, that this is a good alienation, and A shall have the benefit of it, against the daughters of the testator, who were creditors under a marriage-settlement. At law, an executor may alien the effects of the testator, and when aliened, no creditor can follow them; and where the alienation is for a valuable consideration, this court suffers it, as well as at law. " No difference in this court between the power of an executor to dispose of equitable and legal assets." An assignment by an executor of a testator's assets to a person who has a sum of money *bona fide* due, is as valuable a consideration as money paid down."

*Mead* vs. *Lord Orrery* (3 *Atkyns* 236) supports the case of *Nugent* vs. *Gifford*, and holds, that there is no instance of an assignment made by an executor, for a valuable consideration, being set aside in a Court of Chancery, unless it has been done collusively. In *Whale* vs. *Sir Charles Booth*, Lord Mansfield follows Lord Hardwick's decision in *Nugent* vs. *Gifford*, and *Mead* vs. *Lord Orrery*. This case is to be found in a note to *Farr* vs. *Newman et al.*, 4 *T. R.* 625. This latter case holds, that the property of testator in the hands of an executor cannot be levied upon by an individual creditor of the executor, by three justices against Buller, J., who held that they might; but neither of the three foregoing cases is overruled or shaken by *Farr* vs. *Newman*, so far as a voluntary alienation of assets by the executor is concerned.

There are, however, cases qualifying and limiting the doctrine here laid down: the first is *Crane* vs. *Drake*, decided in 1708, 2 *Vernon*, 615; *Andrew* vs. *Wrigley*, decided December 1, 1792, 4 *Bro. C. R.* 125; *Hill* vs. *Simpson*, decided by Sir William Grant, Master of the Rolls, in 1802, 7 *Vesey*, 152; *Taylor* vs. *Hawkins*, 8 *Vesey*, 209, decided by Sir William Grant, in 1803; *McLeod* vs. *Drummond*, 14 *Vesey*, 353, decided by Sir William Grant, in 1807—confirmed, upon appeal, by Lord C. Eldon, 17 *Vesey*, 150, in 1810; *Kean* vs. *Roberts*, 4 *Madd. C. R.* 332, decided by Sir John Leach, Vice Chancellor, in 1819.

This latter case states the result of all the authorities to be, that a purchaser is not bound to inquire into the circumstances of testator's estate, in order to ascertain whether there is a necessity for a sale. That, generally speaking, a purchaser does not become a party to a breach of trust, or *devastavit* by an executor, by buying, or receiving as a pledge, for money advanced at the time, assets, whether specifically given by the will, or otherwise; because this sale, or pledge, is held to be *prima facie*, consistent with the duty of an executor; but that, gen-

erally speaking, he does become party to a breach of trust, by buying, or receiving in pledge, any part of the personal assets, not for money advanced at the time, but in satisfaction of his private debt; because this sale, or pledge, is, *prima facie*, inconsistent with the duty of an executor." *Southerland* vs. *Brush*, 7 *Johns. C. R.* 17, decided by Chancellor Kent, in 1823, follows *Nugent* vs. *Gifford*, &c. ; it is, however, overruled by *Colt* vs. *Lasnier*, 9 *Cowen*, 320, which follows *Kean* vs. *Roberts ;* and indeed the doctrine of this latter case seems to be sustained by Chancellor Kent in *Field* vs. *Schieffelin*, 7 *Johns. C. R.* 150.

The result of all these authorities is most fully, satisfactorily, and ably stated by Justice Story, in the *1st Com. Eq. Juris.* §§ 579, 580, and 581. From these decisions it follows, that a purchaser is not bound to see to the application of the purchase-money, and that where there is no fraud, the assets cannot be followed by a legatee or creditor.—2 *Story's Eq. Juris.* §§ 1127 *to* 1132, and the cases there cited.—*Field* vs. *Schieffelin*, 7 *Johns. C. R.* 150.

And it also follows, from the foregoing principles, that for many purposes, and in many respects, executors are to be considered, by third persons, as the absolute owners of testator's personal estate.—*Griffith* vs. *Frazier*, 3 *Peters' Con. R.* 93 ; *Hill* vs. *Simpson*, 7 *Vesey*, 152 ; 1 *Story Eq. Juris.* § 579 ; *M'Leod* vs. *Drummond, ut supra*, and that the power of sale is incident to the office of executor.—7 *Vesey*, 152.

It may be safely affirmed, that no case can be found, where property sold by an executor in payment of a testator's debts has been followed in the hands of a purchaser. Let it be remembered, that the greater portion of the purchase-money in this case, was paid by the claimants in demands which they held against the testator or his estate, and that the balance was advanced in cash at the time of the sale. Here, then, is no circumstance from which fraud or collusion can be inferred, and consequently there is no excuse or reason to follow the assets. But these authorities are adduced for another purpose, viz : to show that at common law an executor had the power of disposition over the assets of his testator, in any manner he saw proper for the purposes of his trust, and to show, moreover, unless the contrary appears, that when a purchaser advances his money for property of the testator, at the time of the sale, that this is *prima facie* evidence that he did it to enable the executor to carry out his trust. Now, reasoning *a posteriori*, does it not follow, from the effect of these decisions, that the power of sale is necessary to these various acts ? Is it not the very cause which leads to such effects ? Or, setting out with the proposition, that " the power of sale was incident to the office of executor," and reasoning *a priori*, would not the consequences of all these decisions follow, viz : that where one purchased *bona fide*, without fraud or collusion, and advanced his money when the purchase was made, the sale conferred a good title, and the purchaser could not be deprived of his property. This, we take it, is the law, and if we are right, his Honor's opinion is not supported by the common law, but is in direct opposition to it. But, on the other hand, it must be confessed, that this sale was made under a power, and it is contended that its validity depends upon a due execution of that power. This we are ready to concede ; but we say that that power has been duly executed, and that the testator's intention

has been carried out in the sale made to the plaintiffs in error. But it may be asked, if this whole question depends upon the construction and execution of the power, wherefore the necessity of discussing, at such length, the executor's power at common law over his testator's assets, and the consequences resulting from that power? In reply, we have only to say, that the power which the will gives the executor to sell *is* general; that it does not specify the mode in which the sale is to be made, and that his Honor must either hold that the statutes of the State do specify a mode in which such sales are to be made, and that inasmuch as the testator lays down no rule for his executrix, he must be presumed to have intended, that she should adopt and carry out the rule of the statute in relation to executor's sales; or that where the statute does specify a mode, the testator has no right to confer a power to sell in any other mode.

The court need not be reminded, that we have already *shown* that at common law no mode of sale is specified, and we now deny (and shall attempt to prove it in a subsequent part of this argument) that there is a particular mode of sale, under circumstances like the present, laid down in any statute of the State.

We shall contend, too, that when the power is general, and there is more than one mode of executing it, the donee has his option which he will take. This proposition will be argued first, upon the supposition that the law does not specify a mode of sale, under circumstances like the present; and, secondly, that the law does specify such a mode. If it shall be established that no such mode is specified, the discussion of the second point will be useless; and it then becomes a matter of some consequence, to know what the regulations of the common law are upon the subject. It has been shown that there are none at common law, and his Honor may not hope to find shelter and protection there. We hope, therefore, that the materiality of the discussion is apparent. Before examining the rules which govern in the construction and execution of powers, it may be as well to reply to a point to which allusion has been made, though, in justice to his Honor, it must be said that the point (viz : as to the right of the testator to confer a power to sell, in a manner contrary to that which the statute requires) did not enter into his decision, and was not discussed nor insisted upon by him. I have been able to find no case precisely in point, but there are cases strikingly analogous, and which bear directly, and with great force, upon the question. We allude to those cases arising under the statute of frauds.—29 *Char.* 2. This statute directs, that all devises of real estate shall be attested by three witnesses; otherwise they shall be utterly void. Now, there are cases which hold, that power may be conferred upon a person, to convey lands by will, attested by two witnesses; and that a will, conveying lands, and thus attested, would be upheld by the courts as a good execution of the power, notwithstanding the statute.—1 *Sugden on Powers,* 154.

Having disposed of this preliminary question, we are now prepared to discuss the rules which govern in the construction and execution of powers; and here we may safely lay it down as a general rule, which will not be controverted nor denied, that naked powers are to be strictly

construed.—*2 Harrison's Digest*, 1734. "The court, also, is to be governed by the intention of parties in, the construction of powers.—*Pomroy* vs *Partington*, 3 *T. R.* 665. And in the execution of powers, the general rule of law is, that it must be according to the substantial intention and purpose of the party creating the power ; and the general intention must be carried into effect, though it should defeat a particular interest.—*Jackson* vs. *Veeder*, 11 *Johns. R.* 171. And this intention, according to *Buller* and *Ashurst, Js.* in *Griffith* vs. *Harrison et al.* 4 *T. R.* 749, is to be collected from the words of the will, or other instrument, conferring the power, according to the ordinary and common acceptation of the words, and not according to any legal or technical exposition of them."

Now, let us apply these plain and simple rules to the power in question. The testator directs the notes and accounts, which he had in hand at the time of his death, to be applied by his executors to the payment of his debts ; and, in case they should not be sufficient for that purpose, then he directed that a sufficient portion of his estate, real or personal, as his executors should deem advisable, be sold for the payment of his debts. The principal intention here, then, was the payment of debts ; and, in order to carry out this intention, money would be necessary, and that money must be raised from one of two sources, or from both. The executors, under this power, in order to carry out this intention of the testator, were compelled, in the first instance, to apply the notes and accounts, in the hands of the testator at his death, to the payment of his debts ; and, if these had satisfied his debts, the executors could not have sold the property under the power ; and, indeed, they could not have disposed of property, under this power, until it was clearly ascertained that the notes and accounts were insufficient to meet the demands against the estate ; but the instant this deficiency was ascertained, then they were as much bound to sell, as they were, in the first instance, to apply the notes and accounts in the manner directed by the testator ; and, in this case, it was clearly established that the executrix did not undertake to sell until the contingency had happened, upon which she was not only authorized, but bound to sell. But what more ? The testator says, Sell—in a certain event, sell my property ; sell what property you please ; 1 leave it all in your hands, and I invest you with full discretion. 1 do not require you to sell in any particular manner. If a sale becomes necessary for the payment of my debts, 1 invest you with full, comprehensive, general authority to sell. The power I give you is as unlimited, general and broad as language can make it ; and yet, strange to say, his Honor holds that this general power to sell, restricted to no particular mode of sale or conveyance, means a sale at public outery. Such a conclusion is opposed by every principle of sound construction, and is directly at issue with the elementary and general rules of law upon this subject. "Where a particular instrument" (says Sir Edward Sugden in ·his *Treatise on Powers*, 260) "is required, as a deed or will, the power cannot be legally exercised in any other manner." * * * * * But where a power is given generally, without defining the mode in which it must be executed, it may be exercised, either by deed or will, &c. For in-

stances of the great particularity and strictness required by courts in complying with the particular circumstances which the grantor of the power requires in its execution, see *Sugden on Powers,* 264, *et sequitur.*

The whole doctrine is admirably illustrated and expounded by Lord Mansfield in *Darlington* vs. *Pulteny, Cowper R.* 260, where it is held, that a common law power to appoint by deed, executed in the presence of two witnesses, is ill executed by will; otherwise if the power had been to appoint by any writing or instrument or other general term." *Wright et al.* vs. *Wakeford,* 4 *Taunt. R.* 213, decides that a power to trustees with the consent of the *cestui que trust,* testified by writing under their hands and seals, attested by two or more credible witnesses, to make sale of lands, is not well pursued, if the attestation be only sealed and delivered in the presence of two witnesses; and that an attestation, added after many years, witnessing the signing, sealing and delivering at the time of making the deed, will not supply the defect, by Justices Heath, Lawrence, and Chambre, against Sir James Mansfield, Chief Justice.

We do not pretend that these cases are directly in point; we only say that they are analagous to the present case, and that that is within the rule, which they establish. Now, if Wright had directed his executrix to make a private sale, and she had sold at auction; according to these authorities, that would have been a bad execution of the power, and the sale, being contrary to the power, would have conferred no title; and so, if the direction had been to sell at auction, a private sale would not have executed the power; and if he had directed his property to be advertised fifteen days, and then sold at auction, the sale at auction would not have been a compliance with the power without the fifteen days' advertisement, and would have conferred no title upon the purchaser. But is not the converse of the proposition, which the foregoing examples have been given to illustrate, equally true? and does it not follow, from the foregoing authorities, that when the power is general, as it is in this case, and there are more modes than one of executing it, that it is optional with the donee which he will take? Upon the authority, we may conclude, that the sale in this instance was a valid execution of the power, and conferred a good title. Hitherto we have discussed this question upon the supposition, that the statutes did not lay down a rule for sales made by executors. We shall now discuss it upon the contrary supposition; and we think we shall succeed in showing from the authorities, that his Honor is altogether wrong in assuming, that when the law lays down a rule for the execution of an instrument or the mode for the performance of a particular act, that the donee of a general power must, in the execution of that power, when the instrument conferring it is silent as to the mode in or the instrument by which it is to be executed, follow the rule of law. And here it will be necessary, in the first place, to advert to the rule laid down in *Jackson* vs. *Veeder,* viz : that the execution of a power must be according to the substantial intention and purpose of the party creating the power. "No particular solemnities are by law required in the execution of powers; it rests in the breast of the person creating the power to impose such ceremonies as he may think proper. A power may be reserved to be executed by a simple note in writing, or by will unat-

tested or attested by only one or two witnesses, and this, although the subject over which it rides is real estate."—1 *Sugden on Powers*, 154.

The donee may be directed to follow the rule of the statute of frauds in the execution of a power; but then this rule must be arbitrarily asserted by the party creating the power (1 *Sugden on Powers*, 155; *Wilkes* vs. *Holmes*, 9 *Mod. R.* 485); and this requirement may be either *expressed* or *implied*—expressed, as where it is said that the power is to be executed by will attested by two witnesses; implied, as where it is said that a power is to be executed by will, or by will duly attested, or legally or duly and legally attested.—1 *Sugden on Powers*, 297. Accordingly, in *Poulson* vs. *Wellington*, 2 *Peere Williams*, 533, when the power was to be executed by any writing duly attested, and it was executed by deed, attested by one witness, the Lord Chancellor held it to be a valid execution of the power, because the law required the attestation of but a single witness.

But, *quere*, If it had been a power to appoint by any writing simply, and the words duly attested had not been added, would the chancellor have held that any witness was necessary to a valid execution of a power?

This question will be fully answered in the sequel.

In *Saunders* vs. *Franks*, 2 *Madd. R.* 418, the power was to dispose of a lease-hold estate by will, " duly executed and attested." The will of the donee of the power was neither signed, sealed, nor attested : held, that it was not a good execution of the power. The court will here notice that this was a power to be executed in a specified mode, to wit, by will, and that that will was to be duly executed and attested. Another case cited by Sir Ed. Sugden, is that of *Willan* vs. *Lancaster*, 3 *Russel*, 108. I have been unable to procure the book, and must therefore give the case as it is stated in the text of the *Treatise on Powers*, 295. This was a case where customary lands were vested in a trustee for such persons as the owner by any deed or instrument in writing, or by his last will and testament in writing, or by any codicil, or any other instrument purporting to be in the nature of such last will, &c., to be by him legally executed, should appoint: it was held that a codicil, not attested, was not a due execution of the power. In this case, the court will observe that the instrument by which the power is to be executed is required to be duly executed; but there was to the execution of this power by any other than a legal instrument, a most valid and controlling objection, which does not seem to have been noticed. The power was reserved to the grantor to make the appointment, and he could not have reserved the power to make such an appointment by any other than a legal instrument, executed with all the formalities which the law requires.—1 *Sugden on Powers*, 156; *Habergham* vs. *Vincent*, 2 *Vesey*, *Jr.* 204.

These are all the cases, enumerated by Sir Ed. Sugden, bearing upon the point we have been discussing; to them I shall take the liberty of adding that of *Wilkes* vs. *Holmes*, *Mod. R.* 485, where Lord Hardwick decided, " that a will executed by two witnesses was not a valid execution of a power to charge lands by will required in general terms to be duly executed." The decision in *Jones* vs. *Clough*, 2 *Vesey*, *Jr.* 336, was correct, as falling within the principle of *Habergham* vs. *Vincent*.

22

There the power to appoint was reserved to the grantor, and of course he could not reserve the power to appoint by any other than an instrument executed with all the due formalties of law.

Now, these cases do not seem to warrant a conclusion which Sir Edward Sugden (*Powers*, 297) has drawn from them, viz: that where the power is to be executed by will, such a will as the statute of frauds requires will be intended by the court. Upon observing the foregoing cases, it will be perceived that in every single instance, where an instrument has been set aside for want of legal formality, the deed, will or other instrument creating the power, required it to be carried out by an instrument duly or legally executed, duly or legally attested. In fact, in all these cases great stress is laid upon these words, and they seem to be the turning point in the cases. Now, we are aware, that there are *dicta* to be found, which do sustain Sir Edward Sugden's view of this question, but they are mere *dicta ;* there is no reported case, where the point has come directly before the court and been decided ; and, indeed, these *dicta* seem to be loose, and to violate every sound principle of construction.—*See note* 7 *by Mr. Jarman,* 1 *vol. Powel on Devises,* 66.

But we may concede all that Sir Edward Sugden claims from these decisions, and still we contend that his Honor's construction of the power derives no authority or support from them ; the circumstances of these cases, and the one now under consideration, are essentially different in principle ; in the foregoing cases, the power, in every instance, was limited, either by specifying the instrument by which it was to be executed, or where it was conferred to be executed by any writing, by requiring that writing to be duly executed, &c. Now, this is a general power to sell ; it does not say that the sale shall be made in any particular manner, nor does it say that it shall be duly made, or legally made. Now, here is a real *distinction* between the cases in the books and the one before the court, and from this distinction important results follow. One would suppose, from these cases, that where the power given to be exercised, without specifying the mode in which it was to be exercised, no great legal formality would be required in the execution of the instrument, carrying it into effect, inasmuch as the intention of the party in creating the power, is to govern in its execution, and inasmuch as the instrument, carrying out the power, is only required to conform to the formalities of the law, either where the party has so expressed himself, or where he has used general expressions, or terms from which such an intention is necessarily implied. But, fortunately, this conclusion does not rest wholly upon inference, although that inference is strong, and, unquestionably, it has the sanction of some great names to support it. " But it may be observed that, if a will or writing, purporting to be a will, is required to be the instrument by which the power is to be exercised, without saying more, a will, to be a valid exercise of the power, must be executed as a proper will, under the statute (of frauds) ; but that where the instrument creating the power is silent as to the instrument by which it is to be exercised, it may, as it seems, be executed by a will not complying with the statute of frauds."—1 *Sugden on Powers,* 157 ; *Thwaytes* vs.

*Dye*, 2 *Vernon*, 80, *note*. Upon all the foregoing questions, see (*note* B) 11 *Coke*, top page, 474.

This question has been discussed upon the supposition that the statute of the State prescribed certain formalities to be observed in executors' sales, and we have endeavored to show that the testator had a right to confer a power upon his representative to make a sale in a different mode from that required, and that he had exercised that right, and conferred such a power, by giving his executors a power to sell, without specifying the mode in which the sale should be made, and without using general expressions in his will, from which it could be inferred, that he intended that his executors should adopt and follow the rule of the statute, in the sale to be made, under the power given by the will.

But we contend that there is no statute of the State requiring executors (where the testator empowers them to sell) to make their sales at public auction ; and before examining the various statutes upon the subject, we will only premise, that his Honor decided, and we think rightly, that where the will conferred authority, such authority dispensed with an order from the Court of Ordinary to authorize the sale ; that authority in the will stood in the place of such an order, &c.

Now, in the opinion delivered below, and in the argument of counsel, great stress was laid upon the 4th section of the act of 1764, (*Prince*, 223,) which is in these words : " All intended sales of goods and chattels belonging to testators and intestates, shall be published in two or more public places in the parish (county) where such effects are to be sold, and in the gazette, at least forty days before such intended sale."

Upon this act, it was contended that every sale made by an executor, or administrator of personal goods or chattels, must be advertised for forty days, as herein directed, and that the terms goods and chattels, included slaves ; that those terms, when taken in their most extensive signification, generally speaking, do include slaves will not be denied ; but that they do include slaves, as used in this statute, is denied. By the construction which has been uniformly placed upon this act, in practice, those terms are held to embrace only such effects as are commonly denominated perishable property, in contradistinction to slaves : such, for instance, as hogs, horses, sheep, cattle, household and kitchen furniture, farming utensils, &c. There is nothing in this act, or any other that I know of, that requires an order of the court to sell such effects, and in practice, at least, they are usually sold after forty days' notice, not at the usual place of holding sales in the county where they are sold, but at the residence of the testator or intestate. But can slaves be disposed of in a manner so summary, where a sale is ordered by the court ? Let us see if we have no act relating to the sale of slaves ? The act of the twenty-first of December, 1829, (*Prince*, 354,) is an act to authorize " the inferior courts of this State, when sitting for ordinary purposes, to order the sale of any slave or slaves belonging to the estates of testators or intestates or wards." We shall presently see how the provisions of this act, which seem to have some slight bearing upon the subject under discussion, coincide with the act of 1764. The enacting clause is as follows : " It shall and may be lawful for the inferior courts of the several counties in this State, when sitting for ordinary purposes, to order the sale of any slave or slaves, belonging to the estate of any testator or in-

testate or ward, on the application of the executor or executors, admin-
istrator, administrators, or administratrix, guardian or guardians, *which*
shall be at public auction, and on the first Tuesday in the month, between
the usual hours of sale, at the place of public sales in the county where
the letters testamentary of administration or guardianship may have been
granted, giving sixty days' notice thereof in one of the gazettes of this
State, and at the door of the court-house of the county where such
sales are to be held, when it is made fully and plainly to appear that the
same will be for the benefit of the heirs and creditors of such estate, or
of the ward of such guardian or guardians ; provided, that a notice of
such application for leave to sell, be first made known in one of the pub-
lic gazettes of this State, at least four months before any order absolute
shall be made thereupon."

Well, this act is passed to regulate the sale of slaves, and if there is
any point of resemblance between its provisions and those of the act of
1764, it has escaped our observation. This act requires a sale of slaves
to be advertised sixty days in the gazette, at the court-house door
of the county where letters are granted ; but if slaves are goods and chat-
tels within the meaning of the act of 1764, they may be sold after being
advertised forty days in the gazette, and at two of the most public places
in the county where they are sold. This act requires them to be sold at
public auction, and at the usual place of public sale in the county. The
act of 1764 does not require sales of goods and chattels to be so made.
From these and other points of difference in the two acts, we conclude
that they relate to wholly different subjects ; and as the act of 1829 does
profess to authorize the sale of slaves, and to point out the manner in
which they shall be sold—and as neither the terms nor spirit of the act
of 1764 embrace or 'allude to sales of slaves—we conclude, without do-
ing any great violence to the known and ascertained rules of construction,
that the latter act has nothing to do with the sales of slaves by executors
or administrators. And if the act of 1764 even did embrace slaves in the
general terms, goods and chattels, they have been taken from the opera-
tion of those terms by the act of 1829, which repeals the act of 1764, so
far as it relates to slaves.

The question here to be considered, then, arises upon the act of 1829,
and not upon the act of 1764. We have seen, that at common law an
executor is, in many respects, and for many purposes, to be considered
by third persons as the absolute owner of the personal estate of his tes-
tator ; that the power of disposition is incident to his office ; that he has
a right to sell, pledge, assign or mortgage the assets of his testator, for
the purposes of his trust, and that a purchaser, &c., *bona fide*, who ad-
vanced his money at the time of such sale, pledge, or assignment, ac-
quired a good title to the assets so sold, pledged, or assigned ; that he
was not bound to see to the application of the purchase-money; and that
unless fraud or collusion with the executor was shown, a residuary or
specific legatee, or co-creditor, or co-executor, could not follow the assets
into his hands. Now, how does the act affect these provisions of the com-
mon law ? Does it repeal them *in toto*, or in part only ? Does it only
curtail these powers, or does it destroy them altogether ? We answer,
that it does most undoubtedly repeal the general power of disposition
incident to the office ; that it takes from the executor the power which

he had of disposing of specific legacies ; that, in all cases where the will does not direct a sale, or confer such power upon the executor, he must, under this act, apply to the court for its order and direction.    When a necessity is shown to the court for the sale of a specific legacy, the court must order the sale, in order to confer a valid title upon the purchaser, unless the will directs a sale.    It also takes away the power of pledging, mortgaging, or assigning the assets, unless the will so directs, either in express terms, or by the use of such general terms as will warrant the conclusion that such was the testator's intention.

But does it follow from these alterations in the common law, that a statute passed to limit the large powers of executors takes away from testators the right of conferring upon their executors the same powers, which the statute confers upon the court where the will is silent upon that subject ?    Does the statute deprive them of the right of conferring upon their representatives, when they see proper to do so, the large and ample powers they had at common law?    Upon the principles we have heretofore been discussing, it does not : nay, more, the very oath which an executor is obliged to take upon entering on his duties, makes the will his law, and compels him to look to it for his direction, and not to the court, nor to the statutes.    This shows that he derives his authority from that instrument, and not from the court ; and we respectfully contend, that it is only in cases where the will has failed to confer sufficient authority upon him to enable him to carry out his trust, and administer the estate, that he is bound to ask directions from the court, and that the court has a right to interfere.    But what is the fact in this case ?    Is the power of sale left in the hands of the court by this will, or is it taken from the court, and placed in the hands of the executor ?    The third item of the will gives this power to the executor, and it confers it in general and unlimited terms, as we have seen ; there is nothing in it requiring the formalities and requisites of the act of 1829 to be observed, in the sales it orders ; the case does not therefore fall within the provisions of the statute, and the terms of the act only require such sales as the court has a right to order and does order, to be advertised and made at public auction : this we think is altogether clear from the words of the statute.    Let us see what those words are : " It shall, and may be lawful for the inferior courts of this State, &c., to order the sale of any slave or slaves, belonging to the estate of any testator, &c., upon the application of the executor, &c., *which* shall be at public auction," &c.

What shall be at public auction ?    Why, the sale.    But what sale ? The sale which the testator orders, or that which the court orders ?    Now, to what does the pronoun, *which*, refer in the above statute ?    Most undoubtedly to the sale mentioned in the preceding part of the act.    And what sale is that ?    Why, the sale ordered by the court ; there is no other mentioned, alluded to, or embraced, in the terms or spirit of the statute. But what did the testator intend by conferring upon his executrix authority to sell ?    Did he mean that the court should exercise the power concurrently with her ?    If so, where was the necessity for such direction in the will, since the court would have exercised the power, if the will had been silent upon the subject ?    Or, why did he not vest the authority in terms of the statute, if he intended that his representative should make that her rule, or use such general terms as would have war-

ranted the inference, that he intended that the provisions of the statute should be carried out in the sales he ordered his executors to make? We say that he must be presumed to have known the law, in the act of executing his will, and that the third item of that will has a meaning and signification to our minds very different from that which is conveyed to his Honor's. We think that he meant to divest the Court of Ordinary of all the jurisdiction it would have had over the sale of his property if he had given no direction upon the subject. The authority he conferred was general, and it was ample for every purpose.

Now, suppose that the law, conferring this power upon the court, had not restricted its exercise, by designating the mode in which it was to be exercised—had merely given the court power in general terms to order the sales of the property of deceased persons? Would it be contended, for one single moment, that the court could not order the sale in any manner that it might deem best? We think not. Then why, when such enlarged power is conferred by the will upon the executor, is it contended that he must be restricted to a particular mode in its exercise? There is no difference between the cases. In the one instance, the statute is his law, and in the other the will: the authority of the statute is not one whit more binding than that of the will. If the sale had been at public outcry, the gentlemen might have contended, with just as much propriety, that under the power in the will, it should have been private, in order to confer a good title upon the purchaser. Here is a general power to sell, and these general terms include both private and public sales. Now, having shown that this case is taken from the operation of the statute by the clause in the will, we might have closed this argument, but for the fact that his Honor's decision makes one other very important concession to the rights of the plaintiffs in error.

His Honor admits that the will dispenses with an order from the court; that it is the executor's authority to sell; that this authority stands in the place of the order; and we maintain, that where the authority to sell is clear, the purchaser is not affected by any irregularity in the sale, and such irregularity cannot be collaterally inquired into in a suit with a stranger.—*Perkins* vs. *Fairfield*, 11 *Mass. R.* 227; *Thompson* vs. *Tomlie*, 2 *Peters*, *S. C. R.* 157. And now this argument is closed; and in closing it, we can but lament that his Honor's decision is inconsistent in its parts. From a view of all the points, we think that his Honor erred in ruling out the bill of sale.

*By the Court*—NISBET, Judge.

The facts in this case are as follows: James H. Wright departed this life, testate, leaving his wife, Elizabeth Wright, and two other persons, his executors; Mrs. Wright alone qualified. The testator in his will directed that his notes and accounts be applied to the payment of his debts, and should they prove insufficient, he declares it to be his will and desire, "that a sufficient portion of my estate, real or personal, as my executors shall deem most advisable, be sold to pay my debts." The notes and accounts proving insufficient to pay the debts of the testator, she sold a parcel of the negroes at *private sale* to Bond and Murdock, to pay his debts.

According to the testimony, Bond and Murdock were creditors of the estate, to half the amount of the purchase-money, which was allowed them ; the other moiety they paid in cash. The executrix executed to them her bill of sale for the negroes. It is not shown, by the record, that the sale was on any account fraudulent ; no collusion or covin is established. William Zeigler, the defendant in error, being also a creditor of the estate of James H. Wright, deceased, having reduced his claim to judgment against the executrix, caused a levy to be made upon the negroes so sold, as aforesaid, in the hands of Bond and Murdock, the purchasers, as the property of the estate. Bond and Murdock interposed a claim. Upon the trial of the claim, it was conceded that the estate was largely in debt, and that the notes and accounts were wholly insufficient to pay the debts. In support of their title, the claimants tendered the bill of sale of the executrix for the negroes sold to them, and now in controversy, to which the counsel for plaintiffs in execution excepted, upon the ground that it appeared, upon the testimony, that the sale of said property had been made by the executrix privately, and without the statutory notice. The exception thus taken was sustained by the court, and the bill of sale repelled, on the ground that the executrix had no authority to sell at private sale, and that no title could vest in a purchaser, except after advertisement and upon public sale. To this judgment of the court below, the plaintiffs in error except, alleging that it is contrary to law ; that the executrix had authority, under the will, to sell at public or private sale ; and that, therefore, the title of the purchasers is good.

It was not exactly regular to attack this title thus collaterally ; it was competent for the creditors, in a different form of proceeding, to have made a direct issue upon its validity. But waiving this point, we adjust ourselves to the consideration of the questions made in the assignment. They are of great practical importance in this community ; questions upon which executors and guardians, very generally, no doubt, are willing to receive the instructions of this court. The main question made in this case, is this : do the purchasers acquire a good title to the property, as against the creditors of James H. Wright, deceased ? This question depends altogether upon the previous question, viz : had the executrix the power, under the will of her testator, and by the laws of Georgia, to sell, as she did sell, at private sale ?

It is proper to remark, that the learned counsel for the defendants in error, admitted in argument the power and right of the executrix to sell, contending, however, that she could not sell at private sale, but must sell at public sale, and in the manner pointed out by the acts of our own Legislature. This admission narrows somewhat the inquiry ; yet, to a fair elucidation of the points in controversy, we find it necessary, briefly and rapidly, to review the common law doctrine, as to the power of an executor over the estate of his testator, and as to the rights of purchasers setting up title under an executor. In England, it is a general rule, that an executor has an absolute power of disposal over the whole personal estate of the testator. The realty descends there to the heir ; and as real and personal estates are by statute upon the same footing here, we might say that this power extends in Georgia to lands.

Another general rule of the common law is, that the effects cannot be followed in the hands of purchasers by creditors or legatees ; nor are

they required, before buying, to look into the accounts of the executor, to ascertain that he is faithfully administering his trust; the law presumes this, in his favor.   Nor are purchasers required to see to the proper application of the purchase-money: in the language of Lord Thurlow, in *Scott* vs. *Tyler*, " What becomes of the price, is no concern to them."   These are general rules of the common law, and are founded in the most obvious expediency ; indeed, in the most manifest justice to the trustee, his *cestui que trust* and the alienee.   Without such a power of disposition, an executor could not execute the trust devolved upon him, and therefore no one would be found to fill fiduciary situations.   The departed would in vain have left wills, for nobody would execute them.   Without such immunity to purchasers, no one would deal with an executor.— *Williams' Exrs.* 671–675, sec. Am. ed. ; 4 *Term. R.* 625; 1 *Atk.* 463 ; 1. *Cox R.* 145 ; 2 *Dick. R.* 725 ; 2 *Story's Eq.* sec. 1128–1130 ; 7 *Johns. Ch. R.* 150 ; 3 *Atk.* 235 ; 2 *Vesey R.* 269 ; 2 *Vesey R.* 466.

These are general rules, and are not without exceptions.   Exceptions to the general power of an executor to dispose of the estate of his testator, will be found in those cases only where *collusion* exists between the representative and the purchaser.   That an executor may waste the trust estate, is not sufficient to invalidate the sale ; it must further appear that the purchaser participated in the *devastavit*.   Fraud and covin will vitiate any transaction ; and if the purchaser *concerts* with an executor, by obtaining the testator's effects at a nominal value, or at a fraudulent undervalue, or by applying the value to the purchase of other effects for the behoof of the executor ; or if he knows, that, from the face of the transaction, the executor is applying the assets to the payment of his own debts ; in all such cases, and all others falling within the reason of these, not only will the executor be liable over for a *devastavit*, but the purchaser buys at his peril—gets no title, and holds the property encumbered with the trust.—See the whole doctrine reviewed by *Chancellor Kent* in *Field* vs. *Schieffelin*, 7 *Johns. Ch. R.* 150.   It is, as I have already stated, not necessary, in general, that the purchaser should look to the application of the purchase-money ; where, however, a trust is created for the payment of specific *debts*, or for a special object, the purchaser is bound to look to the application of the purchase-money.—*Story's Eq.* sec. 1127–1130 ; 3 *Mason*, 218.

Now, as in this case there was no fraud, or collusion, or covin, between the executrix and the purchasers, according to these general common law principles, they acquired a good title.

The power to sell is an incident to the office of an executor, without directions to that effect in the will; if the will authorizes or directs a sale, *a fortiori*, he is empowered to sell : indeed, he has no discretion ; he is bound to sell.   The will is the law of the trust, and the measure of his obligations.   He may not depart from its requirements, unless, indeed, they be in violation of the laws of the State.   Whatever title the testator himself has to his effects, his executor under a power in the will may convey.   These are principles so familiar, that I deem it useless to cite authorities to them.   By the will of Mr. Wright, his executors are expressly authorized to sell his real or personal estate, " as they may deem most expedient," to pay his debts, upon the contingency that his notes and accounts would not be sufficient to pay them ; that contingency occurred,

and in pursuance of the will, a number of the negroes were sold. Now, unless that sale was void for some cause growing out of the statute laws of Georgia, the purchasers, beyond all controversy, acquired to them the same title which the testator had, and a title, too, good against his own creditors. The conclusion of the law is, that the executor will apply the proceeds of the sale, *bona fide*, to the extinguishment of the debts, and there is no equity in the creditor's receiving the price, and then also appropriating the property. The purchasers were themselves creditors, to the extent of one-half the purchase-money ; the extinguishment of their debts was a valuable consideration. They had as much right to be paid as other creditors, and stand before this court upon the same footing to the extent of their claims against the estate with the plaintiffs in execution. As to the other moiety of the purchase-money, they having paid that in cash, occupy the ground of *bona fide* purchasers. It is not a sufficient answer to all this, to say, as was said by counsel for the defendants in error, that the estate was wasted ; that these purchasers were favored as creditors contrary to law ; that the estate was insolvent, and the debts ought to have been paid according to the grade established by statute. It is no answer to say, that the recognition of this sale is a practical abolition of the law, which designates the order in which the debts of an insolvent estate are to be paid. The reply to reasoning of this kind, is this : If the executrix has mismanaged the estate, she is liable personally for the *devastavit*. Farther, if the creditors were apprehensive that the estate would prove insolvent, and knew that the executrix was mismanaging it, equity stood ready to furnish them with a process to compel her to administer the trust according to law. If it is still urged, as it was urged, that this is a hard case, then we reply, the general rules of the law cannot give way to the imaginary or real hardships of particular cases ; the safety of all rights depends upon the unrelenting universality of the laws which protect them.

But, conceding the power and the obligation in this case to sell, it is contended, that, inasmuch as the will is silent as to the manner of the sale, it was the duty of the executrix to have sold in the manner pointed out by the laws of Georgia, regulating the sale of slaves by executors ; not having sold according to this manner, the sale is therefore void. It is, to be more definite, contended, that the executrix should first have applied to the Court of Ordinary, and obtained an order for the sale of these negroes ; that the sale should have been at public auction, on the first Tuesday in the month, at the place of public sales, in the county where the letters testamentary were granted ; having given sixty days' notice thereof in one of the gazettes of this State, and at the door of the courthouse, in the county where the sale was intended to be held. These are substantially the requirements of the act of 21st December, 1829.— *Prince*, 254. The defendants in error also rest their case upon the act of February 29th, 1764, which requires " all intended sales of *goods* and chattels belonging to testators or intestates, to be published in two or more public places in the parish where such effects are to be sold, and in the gazette at least forty days before the day of such intended sale.—*Prince*, 223.

We are of opinion that the act of 1764, for reasons which we shall presently give, has no relevancy to this case ; and the first remark we

make upon the act of 1829 is this : it was intended to apply only to cases where the will gave no instructions whatever as to the sale of property. The Court of Ordinary is authorized to grant an order for sale, upon the application of the executor. What need, it may be asked, of such an application, if the testator has himself directed a sale ? Would the order in such a case be any greater protection to the executor than the will itself ? Certainly not ; it would be an act wholly supererogatory. Suppose that the will directs a sale for a certain purpose, and in a certain way, and 'the Ordinary, upon the application of the executor, should order a sale for a different object, and in a different manner ; would that order be a protection to the executor ? Unquestionably not. If the will speaks at all, its language is both a protection and a' mandate to him. The power of the Ordinary can *in no case* relieve the executor from his liability as trustee, or shelter him from the consequences of a *devastavit.* The most that can be said of these *orders* of the Ordinary is, that they are wisely precautionary—designed to protect the interests of orphans, legatees and distributees, and are only *prima facie* evidence of a faithful administration of their trusts in favor of executors, administrators and guardians. He who believes that an order of the ordinary will protect him from liability as a trustee, will do well to wake up at once from so flattering and false a delusion. The will of a testator, although a complete protection for any act which it legally authorizes, is not itself by any means a protection against unfaithfulness or negligence in the manner of doing it.—But, to return : What necessity is there, we inquire again, under these views of the subject, for an order to sell negroes, when the will directs a sale ? Our conclusion is, that the act referred to never was intended to operate in any such case.

The Legislature never intended to interfere with the right of the citizen to direct the manner in which his estate should be administered ; a right as sacred and as necessary as the right of testamentary disposition itself. They only intended to authorize a sale, in cases where the will, making a general disposition of the estate, is silent as to sales. Cases do often occur, where such sales would benefit the heirs and creditors, without interfering with the dispositions of the testator. These comments on the act of 1829 are made to introduce the following remarks, to wit : in our opinion, the will of Mr. Wright does not alone direct the sale of his negroes, but, by necessary *legal* construction, also directs the manner of the sale ; and if it does, then the provisions of the act of 1829 do not apply to it. There are two ways of selling ; two modes, *public and private.* We say nothing of *degrees* of publicity and privacy. Legally, and in the view of common sense, these are the modes of effecting a sale. Now, because the testator did not specify the one or the other, he meant to leave it to the discretion of his executors, to adopt the one or the other, according as they might believe the one or the other would best promote the interests of his estate. And when the executor has elected, that is the mode which the testator meant. In other words, the discretion placed in the hands of the executor is part of the meaning and intent of the will, and it is not competent to strain the construction of a statute, to control the intent of the testator. Such a construction of this will is sustained by authority, and is in accordance with reason. In cases where a power is conferred, and the manner of executing it is not prescribed, and

there are more ways than one of enacting it, the appointee is left to his discretion as to the manner.—4 *Kent's Com.* 331 ; *Sugden on Powers*, 201.

There are good reasons for such a rule of construction. The testator is presumed to have left the mode of the sale undetermined, because he could not foresee whether, in the event it should become necessary to sell his lands or negroes to pay his debts, it would be more to the interest of the estate to sell at public or private sale. In some conditions of the estate, and in some states of the market, a private sale might be most judicious ; at others, a public sale. It might not be the interest of the estate to sell the negroes in one, and only one, county, as the statute directs. It might be to the interest of the estate, with a view to a better price, to take the negroes out of the State to a better market. Considerations of this kind might, and in this case, doubtless, did, enter into the mind of the testator, and, therefore, all these things are left to the discretion of his chosen fiduciary agent. It is a personal trust, both the sale and the discretion as to the manner, with which the Court of Ordinary has no right to interfere. Again : if the testator intended his executors to be subject to the ordinary, under the act of 1829, why make *any provision at all*, as to the sale of his negroes? The power to sell would have existed without any authority under the will. The discretion, therefore, as to the manner, we think, was intentionally devolved, in this case, upon the executors, and the will having thus regulated the manner of the sale, this is not one of the cases contemplated by the act of 1829.

This act, moreover, does not declare that no sale of negroes by an executor shall be made, unless according to its provisions ; it is not inhibitory. It makes it lawful for the Court of Ordinary, on the *application of the executor*, to grant an order for sale, if it is made plainly and fully to appear, that the same will be for the benefit of the heirs and creditors. Upon such application *being made*, the court may, or may not, take, with the executor, the responsibility of a sale, and extend to him the benefit, legal and moral, of the *prima facie* protection which its order will afford. If, upon the application being made, the court grants the order, then the statute prescribes the place and manner of the sale. If no application be made, then the executor is left to the rights and responsibilities which appertain to him under the general laws of the land ; to these he is amenable, under all circumstances and at all events, for the proper execution of his trust. Do we, then, by this construction, make void the act of 1829 ? By no means. Its precautionary protection to the rights of minors, legatees and creditors, in all cases to which it applies, as well as its *prima facie* protection to executors, administrators and guardians, continues. The act of 1764, we think, applies alone to the perishable property of the decedent. "Goods and chattels" do not here mean slaves. If they did, this act, so far as slaves are concerned, is repealed by the act of 1829 ; for that relates to slaves, exclusively, and some of its provisions are in conflict with the act of 1764. It was also claimed, in argument, that the act of 1805 applied to this case. We think not: for its provisions embrace administrators only, and cannot, therefore, be extended to executors. Upon the best consideration we have been able to give to this subject, we are constrained to believe that the court below erred in its judgment, in the questions submitted to us, and, therefore, we reverse it.