THE CITY OF ATLANTA *et al.* vs. THE GATE CITY GAS LIGHT COMPANY.

1. If a charter is granted after having been applied for, acceptance may be presumed from such previous application.

(*a.*) The provision contained in Art. 4, par. 3, §1676 of the Code, that no corporation created under that article shall commence to exercise the privileges conferred by its charter until ten per cent of its capital stock has been paid in, and "no charter shall have any force or effect for a longer period than two years, unless the incorporators within that time shall in good faith commence to exercise the powers granted by the act of incorporation," does not apply to a charter granted by the general assembly, but only to those granted by the courts.

(*b.*) The constitution of 1868, in declaring of force all acts passed by any legislative body since January 19, 1861, including that body of laws known as the Code of Georgia and the acts amendatory thereof, or passed since that time, which Code and acts are embodied in the printed book known as Irwin's Code, with certain named exceptions, did not intend to adopt as law every inaccuracy which may have crept into that book.

(*c.*) The charter of a corporation may be forfeited for a willful violation of any of the essential conditions on which it is granted, or for a misuser or non-user of its franchises, but its dissolution for either of these causes can be effected only by the judgment of a court of competent jurisdiction declaring the forfeiture, and dates only from such judgment Misuser or non-user cannot be set up collaterally as a defence to an action.

2. Where a manufacturing company was regularly and legally chartered by the legislature under the constitution of 1868, the fact that it was suffered to lie dormant and was not organized until after the adoption and ratification of the constitution of 1877, did·

not bring it to an end and make it necessary that such company should obtain a new charter from the court.

3. Municipal corporations are created by the general assembly and may be destroyed by them. No rights are vested in such corporations as against the state. They can exercise no other powers than those conferred by the acts creating them; they are subordinate agencies to assist in the administration of the government of the state. Over their streets, lanes and alleys, it would seem that the state, through its legislature, has as much power and control as it has over other public highways, which it may change, alter or abolish at will.

(a.) The legislature could authorize a gas company chartered by it in 1875 to use the streets of an incorporated town or city for its pipes and fixtures, and the permission of the city was not required to enable the company to exercise its franchises, and any ordinance, interfering with or denying the exercise of a right thus granted by the legislature, has been held void.

(b.) Whether the state can delegate to a subordinate tribunal or agency the power to modify charters. *Quære.*

(c.) The city of Atlanta having stood by and seen the company make an outlay of $140,000 in the exercise of their rights under this charter, without intimating to them that objection would be made to the use of the streets for the purposes authorized, without the use of which their enterprises would not have been undertaken, and could not be prosecuted, and they would lose their entire outlay and be ruined, such city would now be estopped from refusing to allow the laying of the pipes, etc.

4. A mandamus was not required to force the consent of the defendants in the bill to the exercise of the company's rights and privileges under its charter. Their exercise does not depend on such consent.

5. While a court of equity will not interfere by injunction with the prosecution of a criminal proceeding not touching the enjoyment of property, yet where it is evident that private property and civil rights are invaded by such means, equity will interfere to protect them.

October 9, 1883.

Corporations. Municipal Corporations. Charters. Constitutional Law. Streets. Laws. Estoppel. Before Judge HAMMOND. Fulton Superior Court. April Term, 1883.

v. 71—8

Reported in the decision.

W. T. NEWMAN; HOPKINS & GLENN, for plaintiffs in error.

E. F. HOGE; N. J. HAMMOND, for defendant.

HALL, Justice.

The Gate City Gas Light Company brought suit on the equity side of the court against the City of Atlanta, the mayor of said city, and its engineer, and alleged by its bill that it was incorporated by an act of the general assembly of Georgia, approved the 4th of February, 1875; that in addition to the powers conferred on such corporations, of having and using a common seal, etc., full power and authority was granted it to make, manufacture and sell gas, to be made of coal, rosin, or other materials, for lighting the streets, public and private buildings, and other places in the city of Atlanta, and "to lay down in any and all of the streets, lanes, avenues, alleys, squares and public grounds of said city, gas pipes, and other apparatus for conducting gas through the same, and to erect therein such gas posts, burners and reflectors as may be necessary or convenient," "only provided that the public thoroughfares shall at no time be unnecessarily interrupted or impeded by the laying down or erection thereof, and that said streets, lanes, avenues, squares and public grounds shall not be thereby injured, but shall be left in as good state and condition as they were before the laying down of said pipes, conductors, or other apparatus, and the erection of said posts."

Said complainant purchased a parcel of land in said city, in ward one (1), on land lot seventy-eight, fronting on the right-of-way of the Central Railroad one hundred feet, and running back on an alley one hundred and fifty-seven feet, joining Mrs. M. F. Parker on the north, and E. L. Jones on the south, and built thereon, in a tasteful and most durable manner and style, all the structures required

for its business, using over five hundred and thirty thousand bricks, and other materials in proportion.

Complainant placed in said buildings machinery and apparatus for the manufacture of gas, duplicated and of a capacity to supply a city of over one hundred thousand inhabitants.

The quality of said materials and style of workmanship cannot be excelled, and has never been equalled in the Southern States, and is open to inspection at any time.

The company has had cast mains for eight miles of streets. Fourteen car-loads of the same had arrived in Atlanta prior to the 4th of May, 1883, and the remainder was then en route for Atlanta (and part of the same has since arrived).

The company had then employed Hunnicutt & Bellingrath, of Atlanta, men skilled in such work, and responsible, to lay down said pipes, and erect said structures.

These mains are large enough to be so extended as to accommodate three hundred thousand inhabitants.

The company put extra work and expense upon its said plant. Their outlay for these Atlanta works already made is about one hundred and forty thousand dollars.

The company *bona fide* intends making and selling good and cheap gas to the city of Atlanta and its inhabitants, and would be now preparing therefor but for the reasons now to be stated. Being ready to begin laying its pipes and desirous of the co-operation of the city authorities of the city of Atlanta in its work, so as to avoid all misunderstandings and disagreements as to grades, etc., complainant addressed to the mayor and general council of the city of Atlanta a written request for the co-operation of their body or of the proper officer of said city in so beginning their work. The same was, on the 27th of April, 1883, referred to their city attorney and gas committee "to investigate and report all facts." Said committee did, on the 7th of May, 1883, report in writing that they had fully investi-

gated, and that the facts hereinbefore stated as to the purchase of land, the buildings and machinery, and apparatus therein, the piping being ready, and contract being so made to lay it down as before stated were, in their opinion, true, and which in their said report they denominated as " the petition of the Gate City Gas Light Company asking permission to lay their mains through the streets of said city."

On said 7th of May, 1883, after consideration of said report, said general council " refused " the request of complainant. Afterwards, to-wit, on the 11th of May, 1883, said company, still asserting its charter rights, but desirous of complying with all proper precautions to prevent collision with the city authorities, addressed to the city engineer, in accordance with section six hundred and twenty-one of the last revised Code of Atlanta, a written request for permission to dig streets for the purpose of laying such mains.

On the said 11th of May, 1883, said city engineer replied thereto, refusing his permission, because of the action of the mayor and general council aforesaid.

On the day last aforesaid, said company gave written notice to the mayor of said city of the foregoing correspondence with the city engineer, denied his right so to refuse, and asked whether the mayor would interfere with said company in so laying its pipes as is allowed by its charter.

Thereupon, on the 12th of May, 1883, said mayor, in writing, replied that, as the executive officer of the general council he should certainly regard it as incumbent on him to conform to the will of that body as expressed (as aforesaid) on the 7th of May, 1883, by enforcing against the company and its agents any and all penal laws or ordinances of the city of Atlanta, violated by the obstruction or interference with the streets of the city for laying mains, or excavating therein, without the permission of the mayor and general council or city engineer for such purpose

first had and obtained, by having the parties participating arrested and tried, because said mayor understood (as he said therein) the mayor and general council to be vested with the discretionary authority of granting or refusing such permission.

Complainant shows that said defendant is a public corporation, having no authority except that expressed in its charter. By its charter or act of incorporation, as amended by an act of the general assembly of Georgia, approved on the 28th of October, 1874, the "inhabitants" of Atlanta were " continued a body corporate by the name and style of the City of Atlanta," "with power to govern themselves by such ordinances, resolutions and by-laws for municipal purposes as it may deem proper, not in conflict with this charter nor the constitution and laws of this state, nor of the United States." Code of Atlanta, §1.

By said charter the mayor and council of Atlanta elect the city engineer (*Ib.*, 96), and other officers there named, "whose duties shall be prescribed by ordinance " (*Ib.*, 96). He is "removable for cause, to be judged of by the mayor and general council " (*Ib.*, 96).

By their charter said mayor and general council have power to open, lay out, widen, straighten, or otherwise change streets, fix a system of grading and draining the same, to require streets and sidewalks paved, and to close lanes and alleys. But said corporation does not own the streets of said city in fee, and has no control over them, except what is necessary to enforce such ordinances as it has made or may make, not inconsistent with the laws of said state.

Among the ordinances made by the said corporation is this :

§621. "Any person who desires to excavate any street to any extent, for the purpose of laying sewer or gas pipes, or for any other purpose, shall get permission, in writing, from the city engineer, which shall specify the streets and portions thereof which are to be so excavated, and the length of time for which such permission is granted. During the time such work is progressing lighted lanterns

shall be placed on either end of said excavation, and any piles of dirt or material.

"The top soil and rock, if any, shall be carefully kept apart from the clay or lower earth, and shall be replaced in as good condition as the same was before, or to the satisfaction of the engineer.

"Any person or persons violating this section, or any part thereof, shall, on conviction, be fined not more than one hundred dollars, or imprisoned not more than thirty days."

This ordinance was passed on the seventeenth day of May, 1880.

Another of said ordinances is this:

§654 "No person shall place any trash, timber, wood, glass, or other obstruction in any public street, lane, alley, or way in said city, or on any sidewalk.

"Any person who shall place any obstructions as aforesaid in any public street, lane, alley or way, or on any sidewalk, failing or refusing to remove the same within six hours after being notified by the chief (of police) or any member of the police force, or having removed the said obstruction, shall replace the same, shall, on conviction, be fined not exceeding one hundred dollars, or imprisoned not exceeding thirty days."

The mayor of said city had called the attention of complainant's solicitor to said ordinances, and hence their specific mention as aforesaid.

By an ordinance passed on the 15th of March, 1872,

"Any person or persons actually building, or about to build or repair any building, may collect and lay all such materials as may be necessary for such building or repairs in the street, lane, or alley next adjoining to or in front of such building or repairs, and shall have the privilege of using one-half of the sidewalk and one-half of the street adjoining." with certain provisos as to interfering with the running of street car lines, and as to lanterns at night to prevent accidents, etc.

The mains to be laid are iron cylinders, each twelve feet long and ten inches in diameter, and other smaller sizes. They are very heavy, and require many persons to handle them, so as to prevent breaking or cracking them, and thereby rendering them useless for the purpose of distributing gas.

Before they can be put into the ground they must be

distributed along 'and upon the several streets named in the exhibited letter to the city engineer aforesaid, which are the same as were shown to said committee of defendant. The ditches into which they must be sunk for said purpose must be three feet deep by city ordinances, and many more employés must be at work digging the same, in order to accomplish the purposes of the complainant and restore the streets to good condition.

Complainant, besides the plant already mentioned, has contracted for the casting of three other miles of piping for distribution of gas in said city. Its arrangements are made for a speedy consummation of their *bona fide* purpose to make and sell gas in Atlanta for public and private use under said charter..

The general assembly of Georgia, by its said charter, annulled any and all ordinances, before or after made, which would deprive complainant of the right to so put in its pipes, etc., as by its charter allowed.

The mayor and general council of Atlanta, the creatures of the general assembly, have no authority to deny complainant the rights granted it by said creator.

The purpose of the application of complainant to the mayor and general council has been by them misunderstood. The mayor and the city engineer misunderstood it and the effect of the action of that body thereon, and upon that false opinion or understanding, undertake to do what neither of them has a right to do.

The city engineer has no right to refuse the permission asked, and the mayor has no right to consider the gas mains which complainant intends distributing in said streets as " obstructions " placed therein, nor to prevent the distribution and laying them in the streets, by having the agents of the complainant so distributing and laying them down arrested for so doing.

. That such persons as may be put upon trial for so doing can successfully defend themselves, and will so do, this complainant doubts not. But that is not a matter with

which complainant has any concern, the judgments in these criminal cases will in no wise bind or affect this complainant. But the prevention of said employés from distributing said works and mains, and laying them in their proper places in the streets of Atlanta, by any arrest, will be a trespass upon the rights of this complainant, guaranteed by its charter.

It will postpone until inclement weather and indefinitely the use of the valuable works aforesaid, and cause injury and loss to them for want of use. It will prevent said company from an early entrance into the market with its gas for sale to the public and private persons, and otherwise irreparably damage complainant, because its loss cannot be estimated accurately and fully. It, therefore, has no adequate remedy at law, even if defendants be liable for such damages and able to respond.

What reasons the city of Atlanta, or its mayor and general council, had for its refusal, were not by that body put in writing. Perhaps each individual had his own peculiar reasons for his vote thereon. But complainant has heard that said mayor and general council pretend that it is not to the interests of the citizens of Atlanta to have the works of complainant completed; that complainant is not in good faith intending to complete the same; and that by law said mayor and general council have authority to keep out of the streets of Atlanta complainant's works, in spite of said acts of the general assembly of the state incorporating complainant.

But the citizens of Atlanta have no such adverse interest. Complainant is, in good faith, intending to complete the same promptly, and said body is not by law the judge of whether such is the interest of citizens of Atlanta, nor of its motives and purposes, and has no authority to resist the will of the state so legally expressed as aforesaid.

If either the mayor aforesaid, or said mayor and general council, or said city engineer, has any such discre-

tion in the premises as will, in law, allow them, or either of them, to grant or refuse permission to complainant to distribute its pipes through said streets and bury them therein, such permission should not have been withheld. Its refusal was an abuse of such discretion. Defendants cannot at law be compelled to give such permission.

The prayer was for a *mandamus*, if deemed necessary, ordering and commanding the defendants to grant the permission asked by complainant, and also for an injunction directed to defendants, restraining them, and either of them, their servants, employés, and officers from interfering by arrest or otherwise, under any pretence, with the right of complainant, its agents and employés to distribute and lay down pipes, and excavate said streets therefor as stated aforesaid, and from interfering in any way with the prosecution of the work under said charter and according thereto.

Upon filing of the bill, to-wit, on May 15, 1883, Judge Hammond passed an order requiring defendants to show cause on May 17, 1883, why the injunction prayed for should not be granted.

Service was duly perfected on the defendants.

On May 17, 1883, the hearing was postponed by order of the judge, and came on to be heard by consent on May 24, 1883.

Defendants relied upon a special demurrer of misjoinder of the prayers for *mandamus* and injunction, and a general demurrer; also a plea, which was as follows:

"Defendants for plea in this behalf say: That the act of February 4, 1875, named in the bill, was never accepted by the corporation named therein. nor did they organize the company mentioned in the act. There was no attempt to organize said company under said act, nor to exercise the power granted by the act within two years from its passage. Nor was there any acceptance of said act, or any attempt to exercise the power conferred by it until after the adoption of the present constitution of the state in 1877. Wherefore defendants pray that the said bill be dismissed."

116      SUPREME COURT OF GEORGIA.

The City of Atlanta *et al.* *vs.* The Gate City G..s Light Co.

Before argument complainant struck out the prayer for *mandamus*.

Argument on the case was then had, and the court, on the 28th of May, passed the following order:

" On consideration of the foregoing case, after hearing argument of counsel, thé court is of the opinion that the complainant is entitled to the relief prayed for, and it is therefore considered and ordered that the defendants be enjoined from obstructing or in any manner preventing the complainant, its agent and employés, from distributing and burying in the streets, lanes, and public alleys in the city of Atlanta, in a lawful manner, and in due conformity to city ordinances and laws, its gas mains and other pipes for the distribution of its gas, by instituting, commanding, counseling, advising or procuring prosecutions or arrests to be made of any of the complainant's employés for so exercising its rights under its charter.

This order is not intended, and shall not be construed, to prevent the proper ministerial officers of said city from making any arrest of any person for any violation of any city ordinance, or from making a case against any such person, or to prevent the proper judicial officer from trying any such person, but is intended only to secure to complainant the exercise of its rights under its charter, by restraining the mayor and general council from carrying out the policy towards complainant and its employés plainly indicated in the action of the general council and the letter of the mayor set out out in the bill, of using their influence and power towards a prevention of the exercise of those rights by complainant.''

To this order granting the injunction the defendants excepted, and brought the case here upon writ of error.

The case has been argued by both sides thoroughly and with unusual care and ability. For the valuable assistance rendered, this court returns its acknowledgments to the counsel engaged.

1. Upon the very threshold of the case the legal and potential existence of the complainant as a corporation is denied, for the reason that it did not accept its charter by organizing, until the year 1881, and that it had no authority to organize at that time. Under Art. 4, par. 3 of §1676 of the Code, it is provided, that no corporation created under that article "shall commence to exercise the privileges conferred by its charter until ten per cent. of its capital stock is paid in, and no charter shall have any force or effect for a longer period than two years, unless the incorporators,

within that time, shall in good faith commence to exercise the powers granted by the act of incorporation," etc It is urged that, inasmuch as this article and section of the Code treats of the creation of corporations both by the general assembly and by the courts, that the above limitation as to the right to exercise the powers granted applies alike to all grants of charters, whether by the legislature or the courts, and that the charter of complainant falls within this restriction. To which it is replied, and we think properly, that the restriction as to the time in which the per centage of stock is to be paid and the exercise of the powers under the charter shall commence, is not applicable to charters granted by the general assembly, but only to such as are granted by subordinate tribunals, in conformity to authority delegated to them by the general laws of the state.

Premising that, if a charter is granted after having been applied for, acceptance may be presumed from such previous application; indeed, it would seem, in that case, that no acceptance would be required, since the consent of the grantees was given in advance. Morawetz Corp., §16, and cases cited in note 2. It would be difficult to find an instance in which our legislature has granted a particular charter which has not been applied for by the persons thereby incorporated. Those granted by the courts, under authority bestowed by general laws, can only be allowed upon the application of the persons desiring them. The section of the Code in question does not require the acceptance of the charter; it presupposes that it has been already accepted; it only requires the exercise of the power conferred by it within the time specified.

Having disposed of this preliminary question, we proceed to examine the material point made under this section of the Code, viz.: Does this limitation apply to a charter granted by the general assembly? Looking to its history, we are compelled to return a negative answer. It first appears in an act of the general assembly, approved 9th of March, 1866 (Acts, p. 27). By express terms, it is

made to apply to corporations only which are "created un-
der this act." The precise words of the act are, " no cor-
poration created under this act," etc. Now what corpora-
tions were created under the act? They were only such
as could be created by the courts under the general laws
of the state, as embodied in the Code of 1863, part 2, ch. 1,
art. 4, sec. 2, under which there are sundry subsections
from 1627 to 1631, both inclusive, of which this act was
amendatory. That portion of the Code professed to treat
only of corporations thus created. Neither its terms nor
spirit embraced others. The amendatory act certainly
authorized no others to be included in its provisions. In
revising the Code, the editor followed the arrangement as
first laid down and published. Section 2, both in the
original and revised Code, treats of the " creation" of cor-
porations. Sub-section 1627 of the old Code declares,
" The power to create corporations in this state rests only
in the general assembly, by whom all charters, either
directly or indirectly, must be granted." The revised Code,
§1674, on the same subject, is as follows: " The power to
create corporations in this state vests in the general assem-
bly and the courts, by whom all charters must be granted."
Doubtless this change in phraseology as to the source of
the power to create corporations, was deemed proper in
order to make it conform more exactly to the provisions
of the constitution of 1865. (Rev. Code, §4940.) The
legislature was thereby inhibited from "granting corporate
powers and privileges to any private companies, except to
banking, insurance, railroad, canal, plank-road, navigation,
mining, express, lumber, manufacturing and telegraph com-
panies," but as to the creation of others than those enumer-
ated, they were required to prescribe by law the manner
in which that power should be exercised by the courts."
The remainder of section 2 in the revised Code, except
where repealed or as modified by the act of 9th of
March, 1866, is, with the substitution of article for act,
identical with that in the old Code as amended by the
said act. What was left of that section was united to the

SEPTEMBER TERM, 1883. 119

The City of Atlanta *et al.* *vs.* The Gate City Gas Light Co.

act, and, as thus fused into each other, they constituted but a single act, and in that shape, make up the entire section under this article in the revised Code. That "article" was inaccurately, and, perhaps incautiously, used for "section" or "act," is quite apparent from the foregoing account, as well as from the fact that the compiler refers to, and copies, this portion of the act literally, except as to this verbal inaccuracy; indeed, he says, in his preface, that he "did not feel at liberty to change even the wording of the laws passed since the adoption of the Code, but embraced them just as they were enacted by the legislature."

The constitution of 1868, in declaring of force all acts passed by any legislative body, sitting in Georgia as such, since the 19th of January, 1861, (the date of her secession from the United States), including that body of laws known as the "Code of Georgia," (evidently designating the original Code), and the acts amendatory thereof, or passed since that time, which said Code and acts are embodied in the printed book known as "Irwin's Code," with certain named exceptions, did not surely intend to adopt as law every inaccuracy that may have crept into that book, especially when such inaccuracy was plainly in conflict with the manifest intention of the legislative bodies whose acts were thus adopted. The framers of that constitution could not have been ignorant of the fact that the contents of the Code were specified in the act authorizing its compilation, that commissioners to make it were directed to prepare for the people of Georgia a Code which should, as near as practicable, embrace in a condensed form, the laws of Georgia, whether derived from the common law, the constitution of the state, the statutes of the state, the decisions of the Supreme Court, or the statutes of England of force in this state " (Acts, 1858, p. 95); or that this act was regarded as a portion of the Code subsequently adopted under it; or that the courts of this state, in construing the Code, had always rejected any apparent unintentional departures from the law it was authorized

and required to embrace; in fact, that it was not to be "construed as changing the old law, unless the change be very apparent." 51 *Ga.*, 269; 37 *Ib.*, 412, 419; 42 *Ib.*, 192, where it was said by this court, "that the object of codification was not to make laws, but to codify or declare those already in existence." "It is true that, in some instances, the Code has changed the law, though these changes are less frequent than is supposed. But in, the main, it cannot be doubted that the Code is to be looked at as what it purports to be—a codification of our laws as they existed at the time, and its provisions are not to be considered as changing the law, unless the intent to change be clear," *Ib.*, 195, 196. Many similar views may be found scattered through our reports and the reports of other states, but these are deemed sufficient. We are well satisfied that, in this instance, no change of the provision in question was intended, or was in fact made.

But if this obstacle could be surmounted, another quite as formidable is encountered by the plaintiffs in error. According to the Code, §1685, the charter of a corporation may be forfeited for a willful violation of any of the essential conditions on which it is granted, or for a misuser or non-user of its franchise, but its dissolution for either of these causes can be effected only by the judgment of a court of competent jurisdiction declaring the forfeiture, and dates only from such judgment. There is no pretence that any of the essential conditions on which its charter was granted have been violated by the complainant; no abuse of its franchise has been charged; but it is said that it has not made use of it within a reasonable time. Who is to judge of this failure to use its franchise within a reasonable time? The state, through its accredited agents and officers, to whom is confided the superintendence of such matters, has not been heard to complain. It has neither instituted a proceeding nor authorized it to be done, to seize to itself the franchise with which it parted, and which, by the terms of the act creating the company, it is permitted to enjoy for thirty years. No one else can institute such a

proceeding. Without it the courts are powerless to act. The state may waive the forfeiture by its non-action ; or, if it were declared, upon a regular proceeding, it might remit it. Certain it is, that the plaintiffs in error cannot avail themselves in this collateral way of any breach of conditions, misuser or non-user on the part of the defendant in error; they can only do this after a forfeiture has been declared by the judgment of the court on a direct proceeding for that purpose. 6 *Ga.*, 154, 155; 14 *Ib.*, 327; 15 *Ib.*, 71; 32 *Ib.*, 292; 60 *Ib.*, 180.

2. Under the constitution of 1868, the legislature alone had power to create a private manufacturing corporation. Code of 1873, §5068. The courts, under that instrument, had no such power, as was expressly decided by this court in 55 *Ga.*, 641. The constitution of 1877 omitted manufacturing corporations from the list of those which the general assembly might create, and remitted them to that class which must be made by the courts, under regulations prescribed by the law for that purpose. Code, 1882, §5077. It is now insisted that, inasmuch as this company, which was regularly and legally chartered under the constitution of 1868, was suffered to lie dormant, and was not organized until the adoption and ratification of the constitution of 1877, it is at an end, and can only be authorized by a new charter granted by the courts. Did the adoption of the constitution of 1877 have that effect upon corporations previously created? We are of opinion that it did not, for it declared of force all laws then existing in the state not inconsistent with the constitution and ordinances of the convention which framed it (Code of 1882, §5232) ; and "local and private acts passed for the benefit of counties, towns, cities, corporations and private persons, not inconsistent with the supreme law, nor with that constitution, and which had not expired or been repealed," were thereby declared to have the full force of statute law, subject to judicial decision as to their validity when passed, and to any limitations imposed by their own terms. That is to say, if they were held valid when passed, they

remained so, notwithstanding any subsequent legislation or any action of the constitutional convention not directly and necessarily in conflict with them. They were not repealed by any but a necessary implication, which, according to some definitions, must be so strong that it is equivalent to an express repeal; or to others, it must be so clear that it is impossible to suppose that the legislative body could have entertained a contrary purpose. 57 *Ga.*, 370. On this line, and closely analogous. is the case of *Smith, ex'r, vs. Hulsey et al.*, 62 *Ib.*, 341, which, to be fully appreciated, should be taken in connection with *Bond & Murdock vs. Zeigler*, 1 *Ga.*, 324. The complainant in this case had certainly acquired an interest in this charter, and had some rights, privileges, and immunities which vested or accrued under it when the constitution of 1877 was adopted; and that constitution provides that "all rights, privileges and immunities which may have vested in, or accrued to, any person or persons, or corporation, in his or their own right, or in any fiduciary capacity, under and in virtue of any act of the general assembly, or any judgment, etc., shall be held inviolate by all courts before which they may be brought in question, unless attacked for fraud (§5204, Code of 1882). From this view it is evident that the constitution of 1877 put no disability upon the complainant to accept and organize under the charter of 1875, but it recognized and protected its rights under that charter. This court, speaking of a similar provision in the constitution of 1868 to that here relied on by the plaintiff in error, in the constitution of 1877, said, in 57 *Ga.*, 370, 377, that the former constitution "seemed to intend a limitation upon future legislation, and not the abrogation of prior enactments." That this was the view taken by the legislature of charters granted by that body prior to the prohibition contained in the former of these constitutions and the delegation of the authority, by law, to the courts, is evident from the fact that the general assembly, at its session held in 1876, made provision for the amendment of such charters by the courts. The language

of the act, p. 33, on this head, is clear and explicit: " The powers conferred in this section shall extend to the amendment of all charters contemplated in said section, whether the original charter sought to be amended was originally granted by the general assembly of the state or by the superior courts of this state," (§1675, par. 6, Code of 1882) The cases of Gillespie vs. The Fort Wayne & S. R. R. Co., 17 Ind. R., 243, and Aspinwall et al. vs. Commissioners of Davies County, 22 Howard's R., 364, relied on by the plaintiffs in error, are not in point. They arose upon a clause in the new constitution of Indiana, which prohibited subscriptions to railroad enterprises by counties unless paid in cash, and which likewise prohibited them from loaning their credit, borrowing money, or issuing bonds for such purposes. After that, the county having, under the old law, taken a vote authorizing it, subscribed for such stock and issued its bonds, which were held to be void, because the contract being incomplete, and the authority to make such bonds having been repealed, they were illegally issued. The case in the 17th Ind. R. followed that cited from 22 Howard. Before that time the courts of that state had held otherwise. 16 Ind. R., 190; Ib., 40. These latter decisions were based upon cases from Ohio (11 Ohio S. R., 16 : 6 Ib. 318, 326, 327, 328, 329 ; 2 Ib., 607). It seems that the constitution of Ohio contained no such positive prohibition as that of Indiana, but in that respect it was similar to the clause of the constitution now under consideration, and that these cases accord with the decision of this court in 57 Ga., 370, 377.

3. The next position assumed is that this company should not make use of the streets, etc., of the city of Atlanta without the consent of its authorities first had, as prescribed by its ordinances ; that the legislature did not intend to grant this without such consent, and if such is the extent of the grant, it had no authority to make it.

This is taking high ground and assuming very large powers. The legislature created the city government for

v 71–9

public purposes; the same power which created can destroy it, the life which it gave it can take. There is no legal or constitutional restraint upon the general assembly in this respect. Unlike private corporations, no rights vest in such municipal corporations as against the public at large, which constitutes the state. Indeed, this doctrine has been made to extend to offices and to all matters involving police regulations, such as the licensing the retail of liquors, etc. The People *vs.* Morris, 13 Wend. R., 325, in which the whole question is ably treated by Mr. Justice Nelson, who was afterwards transferred to the bench of the Supreme Court of the United States, where, for many years, he displayed conspicuous ability and learning. It is familiar learning that these corporations, like private corporations, can exercise no other powers than those betowed by the acts creating them. They are subordinate agencies to assist in the administration of the government of the state. Over their streets, lanes and alleys, it would seem that the state, through its legislature, has as much power and control as it has over other public highways, which it may change, alter or abolish at will.

The permission of the city of Atlanta was not required to enable the complainant to exercise its franchises. It certainly was not made a condition by its charter. This was not the contract into which it entered with the state, and it would appear anomalous if a subordinate power could impose terms which the superior did not see proper to impose. This charter was accepted, it is true, subject to repeal or modification by the state; the right to do this is reserved by the general law; but the state alone, under this reservation, can exercise this right. No subordinate tribunal or agency can do this, unless, perhaps, it is expressly authorized to act in that behalf; and it is not clearly settled that the legislature, under this reservation, can delegate this power of repeal or modification to another agency of the government. In doing so, it might subject itself to the imputation of bad faith in sanctioning the vio-

lation of its own solemn engagement through another agency, by thus doing indirectly what it would be unwilling to do directly. This party did not seek a charter whose operation depended upon the will of another, and *non cunstat* that they would have accepted it clogged with such a condition. This was evidently not its engagement; *in hæc fœdera non venit.* Shall the city government of Atlanta be permitted to impose restraints and annex conditions that the general assembly of the state did not see proper to impose? And will the courts countenance, much less aid, in such an attempt? It is not necessary to determine these grave questions in order to dispose of this case, and these remarks are made rather as suggestions bearing upon the point, than as its final decision. That the legislature could authorize the gas company to use the streets of an incorporated town or city for its pipes and fixtures has been decided by this court in cases dependent upon the principle here invoked. 45 *Ga.*, 602; 19 *Ga.*, 486. And any ordinance of the town or city interfering with, or denying the exercise of, a right thus granted by the legislature, has been held void. 12 *Ga.*, 405 (4); 29 *Ib.*, 56; 65 *Ib.*, 231.

But apart from all these considerations, the city of Atlanta has stood by and seen this company make an outlay of $140,000 in the exercise of their rights under this charter, without intimating to them that objection would be made to their use of the streets for the purposes authorized, and without the use of which their enterprise would not have been undertaken and could not be prosecuted, and without which they would lose their entire outlay and be involved in irretrievable ruin. Upon every principle of equity this failure to notify the complainant of their intention until this heavy expenditure had been made, would estop them. Such conduct is fraudulent in the eye of the law, and where practiced upon an innocent party, who is seeking *bona fide* to carry out the provisions of its charter by availing itself of the powers and privileges thereby granted,

would, if anything could, debar them from now being heard. Code, §§2966, 3753, and cases cited under each of said sections.

4. It is unnecessary to discuss the question of remedies. A mandamus was not required to force the consent of the defendants in the bill to the exercise of the complainant's rights and privileges under its charter. It has been seen that their exercise was not dependent upon such consent.

5. That injunction was the proper remedy to restrain the defendants from interfering with and hindering the prosecution of the complainant's work under its charter, is evident, both upon principle and authority. While a court of equity will not interfere by an injunction with the prosecution of a criminal proceeding (53 *Ga.*, 677, (4); 61 *Ib.*, 386 ; 68 *Ib.*, 64), yet, where it is evident that private property and civil rights are invaded by such means, equity will interfere to protect them. "If the charge be of a criminal nature, or offence against the public, and does not touch the enjoyment of property, then a court of equity should not interpose by injunction." On the other hand, where it is manifest, as in this case, that a prosecution and arrest is threatened for an alleged violation of city ordinances for the sole purpose of preventing the exercise of civil rights conferred directly by law, injunction is a proper remedy to prevent injury to the party thus menaced. 33 *Ga.* R., 601 (5), 619; 50 *Ib.* 451.

"A court of equity," says Kerr (Injunctions 2), "has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right of property. If a charge be of a criminal nature, or of an offence against the public peace, and does not touch the enjoyment of property, jurisdiction cannot be entertained.    *    *    But if an act which is also criminal touches also the enjoyment of property, the court has jurisdiction, but its interference is founded solely on the ground of injury to property." Many cases and elementary writers might be cited to sustain the distinction here laid down. They are all contained in

the admirable brief furnished by counsel for complainant in the bill, and will be cited by the reporter when this decision is published.* To arrest the employés of complainants for laying down pipes and erecting posts along the streets of Atlanta, we are satisfied, would be a misapplication of the city ordinances wisely established to prevent the wanton and unlawful injury to such streets, etc., and the obstruction of the same.

The injunction ordered by the court below, while it protects the complainant from unwarrantable interference with its rights, privileges and immunities, is careful to restrain the exercise of none of the legitimate powers and prerogatives of the municipal government of the city, and was, in every view that we have been able to take, a proper application of the authority and discretion vested in that court.

Judgment affirmed.

---

* Cited for plaintiffs in error: 61 *Ga.*, 386; 68 *Id.*, 84; 2 Vesey, Sr., 396; Kerr Inj., 2; 30 Ala., 135; Code, §3198; Code, 1832, § 675, par. 3: *Ibid*, 1867; Const. 1868, Art. 11, par. 3; 16 Conn., 179; M.r. Corp., 12-14; 2 K.nt Com. (9 ed.), pp. 322, 324; Boone Corp., 23; Acts 1875, p. 195; Cons:. 1868, Art. 3, Sec. 6, par. 5; Const. 1877, Art. 3, Sec, 7, par. 18; 22 How., 364; 12 B. Monroe, 144; 17 Ind., 243; Const. 1877, Art. 12, Sec. 1, par. 3, 4, 5; 3 Hill, 531; 28 Mich., 228; 18 Cal., 590; 31 Penn. St., 175; 12 Ill., 1 40 *Id.*, 385.

Cited for defendant in error: Cobb's Dig., pp. 436, 437, 438, 542, 543, 439, 440, 431; 482, 413; 14 *Ga.*, 80; Acts 1853-4, p. 24; Acts 1855-6, p 156 (2); Code, 1868, Art. 4, §§1623 —1643; Acts 1864-5, p. 1; Acts 1865-6, pp. 27, 28; Rev. Code, §1676; Acts 1858, p. 95; Irwin's Code, 1867, §4984; Irwin, Lester & Hill's Code, 1868, § 145; 37 *Ga.*, 412; 42 *Id.*, 192, 195-6; 51 *Id.*, 260; Acts 1866, p. 24; 6 *Ga.*, 154-6 · 11 *Id.*, 324 (2); 15 *Id.*, 71; 33 *Id.* 292; 60 *Id.*, 180; 55 *Id.*, 611; Code, 1882, §5077; 1 *Ga.*, 324 62 *Id.*, 311; Code, 1882, §§5232, 5233; 17 Ind., 243; 22 How., 364; 77 *Ga.*, 370, 377; 16 Ind., 190, 40; 11 Ohio St. R., 16; 5 *Id.*, 318, 326—329; 2 *Id.*, 607; 53 *Ga.*, 675—677; 61 *Id.*, 386; 68 *Id.* 64; Eden Inj., 66; 2 Vesey Sr., 396; Hilliard Inj., 2, 269, 308, 250 note *a*; Kerr, Inj. 2; 50 Ala., 135; 6 Mod. R.. 16; 1 Atkins R., 232; 2 *Id.*, 302; 1 Vernon R., 489; 18 Vesey, Jr., 211, 219; 54 Penn., 401, Amb., 158; 3 Atkins, 750; 5 Vesey, Jr., 129; 2 Story's Eq., §§320-921 (a) 2 Johns. ch. 371, 378—9; 46 Ind., 59; 53 Ala., 193; 6 Daley, 81; 75 N. Y., 368; 32 *Ga.*, 601 (5), 619; 70 *Id.*, 451, 144; 14 Ala., 207; 8 Paige ch. 24, 9; 49 *Ga.*, 70; 2 St ry's Eq, Jur., 893; 1 Barb., 362, 368; 2 Eng. L. & Eq. R., 130; 5 C. E. Greene R., 296; 19 Vesey, Jr, 616, 651; 1 Russ. Cr., 312; 2 Camp. R., 891 C ide, §1537; 1 Russ. Cr., 298; 299; Code §§1537, 4538; 33 *Ga.*, 601 (5); Code, §3102; High on Inj., 308, ch. 14, Sec. 3; 50 *Ga.*, 461; 45 *Ga.*, 602; 19 *Id.*, 485; 12 *Id.*, 405 (4); 29 *Id.*, 65: 65 *Id.*, 231; 75 N. Y., 369; 27 *Id.*, 354 (2); 47 *Id.*, 639 (9); 26 *Id.*, 538; 2 Story's Eq. Jur., 227, §959; 36 *Ga.*, 537.