Voorhees, J.
It will be sufficient for the exposition of the law applicable to this case, to state the following facts:
The petition avers the corporate capacity of the plaintiff, its ownership and possession of the electric street railway, which passed through the defendant village. It recites the source of title to -the railway property now vested in the plaintiff company; that the road was constructed, maintained and operated at great cost and expense upon the faith of .certain acts of the defendant village, through its council and officers, who invited and induced the plaintiff’s predecessor in title_and occupancy, to construct in its streets *218 said railroad, and who consented and acquiesced in the construction and operation of said railway at the time the same was built, and up to about July 1st, 1898.
About July 1st, 1898, the council of said village of Carthage, without authority of law, and without the consent of plaintiff company, passed an ordinance tending to impair the rights of the plain tiff, and threatening to destroy the railway tracks and property of the plaintiff within said village of Carthage.
Plaintiff prays for an injunction to prevent the commission of such threatened acts cf violence.
By amendment to the petition facts are set up of proceedings leading up to the sale of the railway property, under a decree in the federal court, under which proceedings it is alleged the property was sold; and it was alleged that by an arrangement, the purchaser, one Kilgour, was to lease a portion and sell the rest of the railway to plaintiff. The title of plaintiff as obtained through and under said decree in the federal court was set up in the amendment to the petition.
By its answer, the defendant village raised the question of corporate capacity in the defendant village to grant an extension of a railway, constructed by a corporation, organized under the act of May 1st, 1852, and of the capacity of the Inclined Plane Company, the former owner of the railway, to accept such a grant, or to make an extension of its lines.
Plaintiff by reply takes issue with the answer as to want of corporate capacity in said village, or in the Inclined Railway Company, to do the acts claimed by the plaintiff company to have been done by them or by it, in extending its tracks as a street railway, or in accepting the same.
The issue thus presented by the üleadings is principally •one of corporate capacity, and raises a question of law rather .than of fact.
*219 The material facts bearing upon the issue so presented may be summarized, as follows:
The Inclined Railway Company was incorporated April 31st, 1871, under the act of May 1st, 1852, for the purpose of constructing a railroad, the termini of which were to be in the city of Cincinnati and the village of Avondale, Hamilton county. On February 23rd, 1889, the terminus of the road was extended from its northern terminus at the Zoological Garden, in Avandale, to the village of Glendale, the company constructing an incline from Main street to Locust street on the top of the hill. This was done under an ordinance of the city of Cincinnati, passed June IGtb, 1871.
The city of Cincinnati, by ordinance passed December, 1871, granted to the railway company the right to construct a railway from Main to Liberty streeet, and on Liberty to Walnut street; thence on other designated streets to the foot of the incline. October 2th, 1875, said city granted the company the right for thirty years to occupy with double tracks Locust street, commencing at the top of the incline; thence in a described route to the Zoological Garden.
On March 30th, 1877, the legislature of Ohio passed an act ratifying and validating the grants embraced within the ordinances above referred to. (O. L., vol. 74, page 66.)
In 1885, permission was granted to the Inclined Plane Company by the city of Cincinnati, to use electricity as a motive power in the operation of its road. The county commissioners of Hamilton county, having control over the Carthage turnpike, extending from Ludlow avenue to its northern terminus in the village of Carthage, granted to the Inclined Plane Company the right to construct and maintain an exterision of its railway in said pike, in consideration of the company paying into the county treasury on January 1st, 1891, $500.00, and other designated *220 amounts at fixed periods so long as the pike remained under the control of the commissioners.
The village of Carthage passed a resolution requesting the commissioners to grant the right of way to said Cincinnati Inclined Plane Railway Company to construct an electric street railway over said Carthage pike.
Without going into unnecessary detail as to the various intermediate acts and proceedings touching the title of plaintiff company, it may be further stated that: On August 7th, 1894, the village council of Carthage regularly passed an ordinance providing for the extension of the Cincinnati Inclined Plane Railway Company from the northern terminus of the Carthage pike over Main street and Lockland avenue to the north corporation line of the village of Carthage, By this ordinance the right to construct the extension to the northern line of the village was provided for.
For the purposes of this opinion, it will not be necessary to refer to the ordinance or its provisions further than to say, the company accepted this grant, and in 1894, constructed the extension to the northern corporation line of said village, and thence northwardly under grants from other municipal authorities to Lockland and Reading; and it paid annually, until the commencement of this action, to the village of Carthage, the sum of $50.00, as prescribed in said ordinance.
December 12th, 1890, the city of Cincinnati commenced an action against the Cincinnati Inclined Plane Railway Company, in the superior court of that city, praying, among other things, that the Inclined Plane Railway Company might be enjoined from maintaining more than one track over Auburn avenue, between Mason and Vine streets, and be enjoined from maintaining a track on Main street over what is known as route eight, to Fifth street as described therein.
A decree was entered at the general term of the superior court, finding that said railway company was unlawfully *221 maintaining and operating a street railway by double track, on certain designated streets in said city mentioned in said decree, and perpetually enjoined it. from maintaining any of its tracks in Main street, and from maintaining and opearting more than one street railway track on Auburn avenue between Mason and Vine streets.
March 6th, 1895, the Louisville Trust Company (a foreign corporation), commenced an action against the city of Cincinnati in the circuit court of the United States, alleging the execution of a mortgage to it upon this property of the Inclined Plane Railway Company on January 1st, 1889, to secure $500,000 of the bonds of said company, setting forth in its petition the grants by the city to said railway compan) of privileges, etc., and of the construction by the company of its road, and that the city threatened to remove the tracks of the railway company from the streets, and praying for an injunction to restrain the city from such threatened action.
The city answered, and among other things, set forth all the ordinances that had been passed; and also plead the action of the city in the superior court, and the judgment therein, and the affirmance of the same by the supreme court of Ohio.
Such proceedings were had in said action in the United States circuit court of appeals, that it was decreed, that said ordinances were validated by the act of the legislature of Ohio, of March 30th, 1877, and that the city should be enjoined from interfering with the company in the maintenance and operation of so much of its road, as had been construed under the ordinances of December 1st, 1871, and October 27th, 1875. The decision in this action was affirmed by the supreme court of the United States, and remains in full force and effect.
Such proceedings were fuitherhadin the trust company’s said action, that a decree was entered for the sale of said railway in two divisions: One part being the portion lying *222 south of the Zoological Garden, and the other being that portion lying north of the last named point, and extending to the villages of Lockland and Reading. Sale was bad, and through its agent, one Charles H. Kilgour, the plaintiff company became the purchaser of that part of the road extending from the Zoological Garden northwardly, for $187,500. The sale was confirmed and proper deeds were executed to said Kilgour, who subsequently conveyed the same to plaintiff company, and it, on June 4th, 1898, entered into possession and commenced the operation of said railway. August 4th, 1898, it commenced this action.
The cause comes into this court on appeal from the common pleas. It has been ably argued on both sides by counsel by briefs as well as by oral arguments. In the short time this court has had to consider the questions involved, and to assign reasons for its conclusions, it cannot be expected that we will go into much detail in stating our conclusions. Some of our conclusions of law will need be dogmatically stated, for want of time to give reasons therefor,
The first question to wh'ich attention will be directed is: What effect had the act of the legislature of Ohio, of March 30th, 1877, toward validating the ordinances of the city of Cincinnati, theretofore passed on June 16th, 1871, December 1st, 1871, and October 27th, 1875, granting to the Cincinnati Inclined Plane Railway Company (which company was organized under the act of May 1st, 1852),the right to construct a railway in certain designated streets in said city, and to occupy for a period of thirty years with double tracks certain streets, and with single track other named streets in said city. This act of the legislature of March 30th, 1877, being an enabling and curative act,is to be construed as such. Its object and purpose was to give power to corporations theretofore as well as those thereafter to be organized under the act of 1852, the right to hold, lease or purchase, and maintain and operate such portion of any street railroad leading to or connected with the in- *223 dined plane as may be necessary for the convenient dispatch of its business, upon the same terms and conditions ,on which it holds, maintains, and operates its incline plane; provided, that no other motive power than animals shall be used on the public highways occupied by such street railway company without the consent of the board of public works in any city having such a board, and the common council or the public authority or company having charge or owning any other highway in which such street railroad may be laid; and, provided, that no inclined plane railway or railroad company shall construct any track or tracks in any street or highway without first obtaining the written consent of a majority of the property holders on the line of such proposed track or tracks, represented by the feet front of lots abutting on the street or highway along which such track or tracks are proposed to be constructed.
No such purchase or lease shall be made without the consent of the holders of the stock in the company purchasing or leasing, and in the company leasing or selling such street railroad or the owners thereof.
It is contended that the legislature could not validate the grants that had been made by the ciiy to the Inclined Plane Company, under the said ordinance of 1871, and 1875, for the reason that the act could not have a retroactive effect, The rule in regard to the effect of curative statutes is,
i‘If the irregularity consists in doing some set, or doing it in the mode which the legislature might have authorized or made immaterial by prior law, it may do so by a subsequent one,”
On this principle the legislature may validate contracts made ultra vires by municipal corporations, Sutherland on Statutory Construction, section 483.
The most important question to be considered now is: Has the plaintiff company a legal title to the property in *224 volved, namely, the line of street railway described in its petition, and the right to maintain, occupy and operate the same?
Under the proceedings in the United States circuit court to which the city of Cincinnati was a party — although the defendant village'was not a party — the property,said street railway, was sold on foreclosure of mortgages described in that suit, and in which action the validity of the ordinance in question were involved,
The effect of .the decree of the superior court, affirmed by the supreme court of the state, came under review, and it was in said action held and determined, that the ordinances in question were validated by the act of the legislature of March 30th, 1877; and thereupon it was ordered that the city of Cincinnati be and it was enjoined from interfering vith the railway company in the maintenance and operation of its road, and under that decree the property was sold. The purchaser at such sale became and is subrogated to all the rights that the mortgagees had or could have under their mortgages, and the sale so made passes the title of the mortgagor so validated by this decree to the purchaser.
The title of the Inclined Railway Company was directly put in issue by the city in the action of the said, the Louis'ville Trust Company, in the United States circuit court; not only was its title involved, but the city in said action pleaded the judgment of the superior court as affirmed by the supreme court of the state of Ohio in support of its contention, as a bar to any inquiry into the corporate capacity of the railway company to receive or hold these grants, The federal court had jurisdiction of the subject matter, and of the parties, namely, the city of Cincinnati,' the mortgagor, the Inclned Plane Railway Company, and the mortgagee — said trust company — 'and the validity of the mortgagees were necessarily involved, as well as the rights, of said mortgagor,the Inclined Plane Railway Company,under said ordinances.
*225 The United States circuit court having such jurisdiction, its decree determined and settled the title of the mortgagor, as well as of the mortgagees under their mortgages, and by holding that the judgment of the superior court as affirmed by the supreme court, was not conclusive as to the corporate capacity of the Inclined Plane Company to acquire its property,the purchaser at said sale had the right to look to and rely upon the decision of the circuit court as a source of title to the property of the plaintiff. We understand the rule of law to be, that where a party has obtained judgment in his favor, as did the city of Cincinnati, in the superior court, and afterwards becomes a party to another action in which such prior judgment was, or could be pleaded as a bar, but either failed to make the plea, or having made it, the plea was overruled for any reason, and a contrary judgment was entered in the latter case; the last judgment will govern, and the former judgment is, in effect annulled. Freeman on Judgments (4th Ed.), vol. 1, sec. 332; Semple v. Wright, 32 Cal., 659, 669; Semple v. Ware, 42 Cal., 619-621.
“Of two decrees rendered by the same court upon the sams/ rights, between the same parties, the latter decree is binding.’’
Cooley v. Brayton, 16 Iowa, 10; Bateman v. Grand Rapids & I. R. Co., 96 Mich., 441.
The plaintiff company having acquired its title under the decree of the United States court, and being in privity with the rights so adjudicated in favor of the mortgagee, it is entitled to be subrogated and to have and enjoy the rights, privileges and powers which were settled and established by that judgment and decree in favor of said Inclined Plane Company through said mortgagees.
“The purchaser at a sale made for the enforcement of a mortgage or other lien, is subrogated to the rights of the original lien holder, even though the proceedings were in *226 valid and his purchase has been avoided. Unless he secures a title under his purchase, the sale is treated as an equitable assignment of the mortgage to him, and his grantee takes the same right.”
Sheldon on Subrogation, section 31, and authorities cited in notes, 5, 6, and 7.
In Brobst v. Brock, 10 Wallace, 519, at page 534, the court say:
“It is enough that an irregular or void judicial sale, made at the instance of a mortgagee, passes to the purchaser all the rights the mortgagee as such had. For this authority is hardly needed. We may however, refer to' Gilbert v. Cooly, Walker’s Chancery (Mich.), 494; where it was held that though a statutory foreclosure of a mortgage be irregular, and no bar to the equity of redemption, yet the purchaser at the sale succeeds to all the interests of the mortgagee.”
This brings us to the question of the effect of the judgment of the circuit court of the United States, which was affirmed by the supreme court, in the case of the Louisville Trust Company, supra. The trust company was a foreign corporation, and the city of Cincinnati was a defendant, which gave the circuit court in this state jurisdiction of the action. United States constitution, article 3, section 2. The state courts of this state also had jurisdiction to • determine the controversy between-the trust company and the city of Cincinnati involved in the action, In other words, the circuit court of the United States and the courts of this state had concurrent jurisdiction to determine whether the mortgage of the trust company was valid, and whether the corporate capacity and power of the Inclined Plane Company were extended and validated by the act of the legislature of March, 30th, 1877, and the adjudication of either court would have been conclusive upon the other. The judgment of the circuit court of the United States must be given the same force and effect by the courts of this state, *227 as is given to the judgment of the state court. Crescent City Live Stock Company v. Butcher’s Union, 120 United States, 141; 2 Black on Judgments, section 938.
In the case cited, the court said:
“And their (the judges of the .circuit court) judgment or decree when rendered is binding and perfect between the parties until reversed, without regard to any adverse opinion or judgment of any other court of merely concurrent jurisdiction. Its integrity, its validity and its effect are complete in all respects between all parties in every suit and in every forum where it is legitimately produced as the foundation of an action, or of a defense either by plea, or in proof, as it would be in any other circumstances. While it remains in force, it determines the rights of the parties between themselves, and may be carried into execution in due course of law to its full extent, furnishing a complete protection to all who act in compliance with its mandate,’’
The plaintiff company having acquired its title under the decree of the United States court, and it being in privity with the rights so adjudicated in favor of the' mortgagees, it is entitled to have and to enjoy the rights, privileges and powers which were established by that judgment through the Inclined Plane Company, the mortgagor, and in favor ofjthe Louisville Trust Company, the mortgagee.
The conclusion therefore is, that the plaintiff company has a good title to its right of way and the franchises granted by the city of Cincinnati under and by virtue of the ordinances of 1871 and 1875.
The plaintiff company having such title, our next inquiry will be: How, if at all, can the defendant village deprive it of these rights, or prevent the plaintiff from"operating or using its road?
The contention is, that the defendant village was not a party to the suit in the United States circuit court, and therefore is not bound by its decree, and that it has the *228 right by ordinance or otherwise, to abate the railway of plaintiff by removing its railway tracks and destroying the same, or, as prayed for in its amended answer and cross-petition, by decree of the court have a mandatory injunction, requiring the plaintiff to remove its rails from the Carthage pike and other streets in the village of Carthage.
This presents two questions:
First — Can the defendant village abate the railroad as a nuisance by ordinance?
Second — Can it abate the railroad by proceedings in equity by injunction?
As to the first proposition. The questions of nuisance or obstruction must be determined by general and fixed rules of law, and it is not to be tolerated that the local municipal authorities of a city can declare aDy particular business or structure a nuisance in such a summary mode, and enforce its decision at its own pleasure.
By section 2640, Revised Statutes of Ohio, the council of an incorporated village has the supervision and control of all public highways, streets, etc., within the corporation, and shall cause the same to be kept open and in repair and free from nuisances. But the provision does not authorize a village or city council by mere declaration to determine that a certain structure is a nuisance unless it, in fact, has that character.
Justice Miller in Yates v. Milwaukee, 10 Wallace, 497-505, says:
“It is a doctrine not to be tolerated in this counjtry, that & municipal corporation, without any general laws either of the city, or of the state, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself.”
In the process of abating a nuisance there are limitations, both in respect to the agency which may be employed, and *229 as to what may be done in execution of the remedy. The general proposition has been asserted in text books and repeated in judicial opinions, that any person may abate a public nuisance, But the best considered authorities in this country and England hold, that a public nuisance can only be abated by an individual when it obstructs his private rights or. interferes at the time with his enjoyment of a right common to many, as the right of passage upon the public highway, and he thereby sustains a special injury, The public remedy is ordinarily by indictment for the punishment of the offender, wherein, on judgment of conviction, the removal or destruction of the thing constituting the nuisance,if physical and tangible, may be adjudged, or by bill in equity filed in behalf of the people. The plain reason of the rule is, that due process of law requires a hearing and trial before punishment, or before forfeiture of property can be adjudged for the owner’s misconduct. Lawton v. Steele, 119 N. Y., 226; s. c., 16 Am. St. Rep., 813.
Therefore, when the village of Carthage was threatening to destroy the tracks and property of the plaintiff within the village, it gave the plaintiff its right of action against the village, to enjoin it from committing such violence,
Has the village of Carthage the right to resort to its action in equity, as claimed in its cross petition, namely, for an injunction restraining the plaintiff company from operating its railroad in and through the streets of said defendant village?
It may be stated as a fact, not disputed, that the occupancy of the street and turnpike was not only with the consent of the village, but through its council the road was located, extended and double tracked at its special instance and request; or, in other words, briefly stated,'we have a case where a municipal corporation, through its council,invites a company or corporation to come into its corporate limits and to occupy its streets with railroad tracks for the *230 purpose of operating a street railway, and upon such action on the part of the village, the corporation does enter and expends money, equips a line of railroad at great expense, and does other acts and expends large sums of money in equipping its road for use and operation in connection with its line so constructed, by inducements so held out to it by the village.
After such action on the part of the village, suppose it to have acted irregularly in the matter, so far as its municipal action through its council is concerned, can it afterwards repudiate its action, and by a suit in equity or otherwise, revoke its action and destroy the rights and property so acquired by the railway company? We think not. Coming thus into a court of equity the village must come without fault, end its action must be free from taint.
And this brings us to the. consideration of the second proposition that we deem necessary to consider, namely, is the village estopped?
The village of Carthage did more than to stand by and silently see the corporation, the predecessors of the plaintiff in the chain of title, construct a street railroad in and upon its streets. It, by resolution and by solemn acts of its council, urged and encouraged it to do so. How can that same village be heard to saythat the action of its council was wrong, unauthorized, and that it had no power to give the privileges or make the grants it attempted to do? We think this is a question the village is not in a position to raise in a court of equity. The village is in the same position of a party who stands by and sees a public enterprise, such as a railroad, constructed in its streets at great expense with other valuable interests attached thereto. It is then too late for it, after the enterprise is consummated and large sums of money have been expended on the strength of their action and active encouragement, to seek by induction or otherwise to deny the right of the *231 company making the improvements or its successors to use the property. Goodin v. Cincinnati Whitewater Canal Company et al., 18 Ohio St., 169, 179; Pennsylvania Company v. Platt et al., 47 Ohio St., 366-381.
In the case of City Railway v. Citizens Railway, 166 United States, Justice Brown, at page 566, says:
“All that is necessary to create an estoppel in pais is to show that upon the faith of a certain action upon the part, of the city, which it had power to take, the company incurred a new liability, as for example, by the negotiation of a new loan and the issue of new bonds and mortgage to secure the same,”
The doctrine of estoppel in pais applies the same to municipal corporations as to individuals. Board of Supervisors, Logan Co., v. The City of Lincoln, 81 Ill., 156; Thd Union Depot Company v. The City of St. Louis, 76 Mo., 393; Grant v. City of Davenport, 18 Iowa, 180, 187, 188; The City of Atlanta v. The Gate City Gas and Light Co., 71 Ga., 106; Bigelow on Estoppel, 376; Athens v. Georgia R. R. Co., 72 Ga, page 80; Oshkosh Common Council v. State, 59 Wis., 425; Chicago & Northwestern R. R. Co. v. People, 91 Ill., 251; Rio Grande R. R. Co. v. Bromelle, 4 Tex., 88; Herman on Estoppel (1st Ed.,) page 527, section 563; Tone v. Columbus, 39 Ohio St., 281-310; Lane v. Kennedy et al., 13 Ohio St., 42-49; Elster v. Springfield, 49 Ohio St., page 82-98.
Considerations of public policy as well as recognized principles of justice between parties, require that we should hold in this case that the property of the plaintiff cannot be interfered with by the village of Carthage; nor can it now revoke the action of its council whereby it granted the right to occupy its streets for the plaintiff’s street railway.
The cross-petition of the defendant village is dismissed *232 and the injunction of the plaintiff is made perpetual; defendant to pay the costs of this action.
E. W. Kittredge and John W. Warrington, for Plaintiff.
Samuel S. Hammel and John R. Sayler, for Defendant.
Adams and Douglass, JJ., concurred