### 27143. HARVEY *v.* MAYOR & ALDERMEN OF SAVANNAH.

DECIDED NOVEMBER 7, 1938.

*Abrahams, Bouhan, Atkinson & Lawrence,* for plaintiff.

*Spence M. Grayson, J. C. Hester,* for defendant.

SUTTON, J. Mrs. Janie H. Harvey brought suit against the Mayor and Aldermen of the City of Savannah for damages because of injuries sustained as a result of a fall in Telfair Square, located on Barnard Street, between State and York Streets, in Heathcote Ward in the City of Savannah, Georgia, the petition as amended alleging substantially that her fall was caused by the slippery surface of a brick sidewalk in said square, the surface of the sidewalk having been rendered slippery by the accumulation of mud and slime formed by puddles remaining on the brick sidewalk, which condition the city had allowed to remain for a length of time, prior to the accident, sufficient to put the defendants on notice thereof, and by the exercise ·of ordinary care plaintiff could not have observed the alleged defective condition of the sidewalk.

It was alleged that "Telfair Square is one of the numerous squares or open parkways which lie at regular intervals along the principal streets of the older part of Savannah. Its dimensions are

approximately 200 feet each in length and width. Barnard Street, which is a heavily traveled thoroughfare, stops at said square, branches out in each direction around said park, then meets again at the opposite side. Telfair Square was laid out in the original plan of Savannah. It has some trees, flowers, and a few benches in it, but its purpose is in no way recreational, and it has no amusement facilities. People do not go to Telfair Square or congregate there for pleasure, and it was not laid out and is not now intended for such purpose. Sidewalks traverse the square in four directions. The plan of these sidewalks is not peculiar to the squares, but said sidewalks properly belong to and conform to the pattern of the sidewalks of the streets of Savannah. Telfair Square is, in fact, a part of the system of streets of Savannah. The sidewalks through Telfair Square are but a continuation of the sidewalks which run on each side of Barnard Street and President Street, respectively, which streets and sidewalks converge upon Telfair Square. The sidewalks in question were not built by the city in order that the public can enjoy the square for pleasure purposes. They were provided so that pedestrians on Barnard or President Street may conveniently continue their use of said streets across the square. The sidewalk along which petitioner was walking conforms exactly to the line of the northern sidewalk on President Street, and, as stated, is but a continuation of said northern sidewalk across the square. Petitioner was not using the sidewalk or square for the purpose of recreation or enjoyment, but in going through Telfair Square was continuing her way down President Street towards the post office. If plaintiff had not used said sidewalk through the square, she would have been forced to make a considerable detour around same. The Streets and Lanes Department of the City of Savannah, rather than the Park and Tree Commission, inspects and keeps up the sidewalks which traverse the squares. Several of the squares of Savannah have been cut through and paved as a continuation of the streets for automotive traffic. A number of the squares have street-car lines which run through the center of them, and at the time of petitioner's fall there was a street-car line which ran down the center of said square on Barnard Street. Telfair Square is entirely unlike public parks such as Forsyth Park in Savannah, which was laid out many years later and which was designed primarily and exclusively as a recreation center for the pub-

lic at large. In Forsyth Park there are trees, flowers, fountains, a varied system of ornamental walks, numerous benches, tennis courts, basketball courts, baseball diamonds, bandstands, monuments, etc. Forsyth Park is some 50 times larger than Telfair Square. Forsyth Park was 'forever set apart as a public park' by the city, while Telfair Square was and is not intended or dedicated as a place of resort for pleasure and promotion of health, but is simply, as alleged above, a part of the system of city streets of Savannah." A diagram of Telfair Square and its boundaries was attached to the petition as exhibit A.

Negligence was alleged in (a) not providing a reasonably safe path for pedestrians in the northeastern corner of Telfair Square; (b) in allowing the mixture of water and mud, which caused a slimy compound to form and remain in a depression on said sidewalk; (c) in allowing the sidewalk to remain in such condition for a length of time sufficient to constitute notice to the city of its condition. The petition described the injuries which the plaintiff sustained by reason of her fall, and judgment was asked in the sum of $1450 for medical, hospital and nursing bills, and $20,000 as damages for pain and suffering. The court sustained the defendant's general demurrer to the petition as amended, and the exception here is to that judgment.

It is stated in the brief of counsel for the plaintiff in error that the court sustained the general demurrer under the authority of *Cornelisen* v. *Atlanta*, 146 *Ga.* 416 (91 S. E. 415), in which it was held: "Where a city maintains a park primarily for the use of the public, intended as a place of resort for pleasure and promotion of health of the public at large, its operation is in virtue of the governmental powers of the municipality, and no municipal liability would attach to the non-performance or improper performance of the duties of the officers, agents, or servants of the city in respect to keeping the park safe for use by members of the general public. It would not affect the public character of the duties of the officers, agents, or servants of the city that a purely incidental profit might result to the city from its operation or management of the park." It is contended by counsel for the plaintiff in error, however, that the sidewalks in Telfair Square, in which the plaintiff was injured, were shown by the petition to have been maintained by the city in the exercise of a ministerial function; that the squares of Savan-

nah, Georgia, including Telfair Square, are not primarily intended or maintained as public parks or places to which citizens resort for pleasure and health, but are thoroughfares; that the squares are a part of the system of city streets, the sidewalks traversing the squares being maintained by the muncipality as a continuation of the sidewalks of the streets which converge upon the squares, and that the maintenance of such sidewalks is a non-governmental function; that the legislative history of the squares reveals that they have always been treated in the same class with streets, and that even if Telfair Square be a park the plaintiff was using the sidewalk as a continuation of the sidewalk along President Street and as a public thoroughfare, and was not in the square for health, enjoyment, or recreation.

Code, § 69-301, provides: "Municipal corporations shall not be liable for failure to perform, or for errors in performing, their legislative or judicial powers. For neglect to perform, or for improper or unskillful performance of their ministerial duties, they shall be liable." A square is defined in Funk and Wagnalls New Standard Dictionary as "An open area in a city or village left between streets at their intersection." A square or area left between intersecting streets may often constitute a park, frequented by the public for purposes of health or pleasure. A park maintained by a municipality for such purposes has been held in this State to be in the exercise of a legislative or judicial function. But it is contended by the plaintiff in error that the definition of "square" above quoted is applicable to Telfair Square, and, although it is alleged in the petition that it has some trees, flowers, and a few benches in it, Telfair Square's purpose is in no way recreational, and it affords no amusement facilities, and is not a park.

The brief of counsel for plaintiff in error contains an interesting discussion of the history and purpose of the squares of Savannah, and the uses to which they have been put in the past, the exposition being made as a basis for the contention that the anciently constructed squares partook of the nature of streets rather than parks, and that the sidewalk, whereon the plaintiff was injured, was maintained by the city in the exercise of a ministerial function. It may be that the original accommodation of these squares was as counsel contend, and we are cited to *The Savannah &c. R. Co.* v. *Savannah,* 45 *Ga.* 602, where the court took occasion to discuss these squares

in connection with a question whether or not the legislature had the "power to grant to a street railway the right to run through the squares intersecting Abercorn Street, in Savannah, without the consent of the corporation, and without compensation to the city," a question which was answered in the affirmative. After stating that "The Mayor and Aldermen of Savannah hold the title to the streets, squares, lanes, etc. in trust for the 'accustomed use of' the inhabitants of the city, under the act of May 1st, 1760, and the acts amendatory thereof," the court, speaking through Montgomery, J., proceeded to examine the expression, "accustomed use," saying: "The original purpose to which the squares were appropriated can only be found, so far as authorities at my command have enabled me to ascertain, in the second volume of the Georgia Historical Collections, pages 252-3, in a paper entitled, 'A True and Historical Narrative of the Colony of Georgia, in America, by Patrick Tailfee (Telfair?), M. D., Hugh Anderson, M. A., D. A. Douglass and others, landholders in Georgia,' etc. first printed for the authors by P. Timothy, at Charleston, in the year 1741. There we find that 'the plan of the town was beautifully laid out in wards, tithings and public squares, . . the whole making an agreeable uniformity.' Again, 'A public mill for grinding corn was first erected at a considerable expense, in one square of the town; but, in about three years' time, without doing the least service, it fell to the ground. In another square of the town, a second was set up, at a far greater expense, but never finished; and is now erased and converted into a house for entertaining Indians, and other such like uses.' These, then, were the uses to which the squares were put, eight years after the foundation of the town, and nineteen years before the act of 1760. It is difficult to understand how the squares could have been used, either as markets or as mill-sites, without being traversed by vehicles of every description. And this must have been the 'accustomed use,' mentioned in the act of 1760, unless the use had changed within the nineteen years preceding the act, of which change I can find no record. When the squares were enclosed, and vehicles and horses excluded, some old ordinance of the city, not accessible to me, may show. This brief historical retrospect shows that the original appropriation of the squares, at least, of those laid out at the foundation of the town, was not as parks, or of pleasure grounds; and therefore, if there is any peculiar sanctity to be at-

tached to dedications of that character (which is not conceded), the original squares of Savannah can not claim the benefit of it. I, therefore, find that in point of fact the squares were dedicated precisely as were the streets."

Thus, in 1872, did the Supreme Court conclude *at that time* that the original appropriations of the squares, laid out when the town was founded, were not as parks or pleasure grounds. In that opinion, however, the court gave recognition to the sovereign right of the people through their legislature to exercise authority over such squares. It was observed that through some undisclosed method the squares were at some date enclosed, and vehicles and horses excluded, and the court thereafter stated: "Indeed, having been diverted without authority of the legislature from the original purposes of the dedication, the question might be raised as to whether the legislature might not compel, if they chose so to do, a return of the use of the same squares to those purposes,—that is, to their use as thoroughfares." But just as the legislature might provide for the restoration of a square to its original use or accommodation, it may also change its use or abolish it altogether for the public good. In *City of Atlanta* v. *The Gate City Gas Light Co., 71 Ga.* 106 (3), it was held: "Municipal corporations are created by the General Assembly and may be destroyed by them. No rights are vested in such corporations as against the State. They can exercise no other powers than those conferred by the acts creating them; they are subordinate agencies to assist in the administration of the government of the State. Over their streets, lanes, and alleys, it would seem that the State, through its legislature, has as much power and control as it has over other public highways, which it may change, alter, or abolish at will." In *Lee County* v. *Smithville, 154 Ga.* 550, 556 (115 S. E. 107), it was said: "So when a municipal corporation is created, it becomes vested with jurisdiction over the highways within its limits. [Citing.] . . The State, through its legislature, has as much power and control over the laying out, construction, maintenance, and closing of the highways, streets, lanes, and alleys of municipal corporations as it has over other public highways. It may change, alter, or abolish either class of these highways at will. The power to have opened, worked, repaired, improved, or closed the public highways, streets, and roads may be exercised by the legislature in such man-

ner and way, and under such circumstances, as it may deem best. There is no constitutional or other limitation on this power in this particular matter."

After the decision in *The Savannah &c. R. Co.* v. *Savannah,* supra, the legislature did in fact legislate with respect to the squares in Savannah. By an act of 1895 (Ga. L. 1895, p. 306), the caption of which was, "An act to create and organize a park and three commissioners for the city of Savannah, to define its jurisdiction and powers, and for other purposes," it was provided in section III: "Be it further enacted, That the said park and tree commission shall have the exclusive management of all matters and things relating to the care, preservation, improvement, adornment, good order, and regulation generally of the parks, squares, grass plats, trees, and flowers of said city; the planting of and caring for trees and grass in the parks, squares, and grass plats, and also in the streets of said city." It was provided in section V: "Be it further enacted, That the said commission shall have entire charge and control of the expenditure of the appropriation of money which may be made by the mayor and aldermen of the City of Savannah, in council assembled, for parks, squares, trees, and grass plats, and flowers, and the same shall be paid out of the city treasury, upon bills or requisitions, certified to by the secretary of said commission, and approved by the chairman or vice-chairman of said commission."

If the park and tree commission was empowered to exercise the exclusive management of all matters and things relating to the care, preservation, improvement, good order, and regulation generally of the parks, squares, etc., it could hardly be reasonably said that the regulation generally would not include the control and management of sidewalks of any kind or dimensions within the squares; and certainly by such enactment the sidewalks became the subject-matter of the exercise of a governmental function by a body which, as distinguished from a street committee, acts in that capacity. Counsel for plaintiff in error contend that the mere fact of placing the square under the jurisdiction of such a body would not make the nature of Telfair Square as one which is "primarily for the use of the public, intended as a place of resort for pleasure and promotion of health of the public at large." (*Cornelisen* v. *Atlanta,* supra). But when we consider the nature of the particular square,

which, as shown in the petition, has at least "some trees, flowers and a few benches in it," and the function of a park and tree commission, the legislative intent, by the act of 1895, was to fix Telfair Square as a park "primarily for the use of the public, intended as a place of resort for pleasure and promotion of health of the public at large," and, consequently, its operation would be in virtue of the governmental powers of the municipality. The maintenance of a park being in the exercise of a governmental function (*Jones* v. *Atlanta,* 35 *Ga. App.* 376, 133 S. E. 521), and the jurisdiction of the park and tree commission extending to all parts of Telfair Square, the maintenance of the sidewalks in such square, since the act of 1895, was in the exercise of a governmental function, whatever may have been the characteristics of the square theretofore.

Nor does the fact that the Streets and Lanes Department of the city, as alleged in the petition, now keep up the sidewalks which traverse the squares of Savannah alter the case. When employed in the square, whether in connection with the shrubbery, grass, benches, or sidewalks, any employee of the Streets and Lanes Department is not engaged in a ministerial act but in one which is governmental. In *Mayor &c. of Savannah* v. *Jordan,* 142 *Ga.* 409, 414 (83 S. E. 109, L. R. A. 1915C, 741, Ann. Cas. 1916C, 240), in which it was held that the duty of keeping the streets of a municipality free from matter which, if allowed to remain, would affect the health of the public, is a governmental function, it was said: "It is not the character or name of the agent who executes the duty of removing the cause of discomfort and ill health to the public which fixes the character of the duty performed, but it is the act itself which determines whether it be governmental or ministerial. It is immaterial whether the work is done under the supervision of the board of health of a municipality, or by the 'Director of Public Works,' or under the 'Streets and Lanes Department.'" It is not alleged in the petition that the park and tree commission has surrendered to the street department its jurisdiction over Telfair Square. It appears only that the first-named body acquiesces in the street department keeping up the sidewalks in Telfair Square. It could forbid the employees of the street department to do any work on the sidewalks in Telfair Square, and could arrange for others to do it. It is that *within which the sidewalk is* that deter-

mines that its repair is in the exercise of a governmental function, and not merely that the thing kept up is a sidewalk.

Much emphasis is laid by counsel for plaintiff in error on the fact that the sidewalks in Telfair Square are, in appearance and size, merely prolongations of sidewalks which are upon streets running to the square, and that one in passing from one of such streets and going through Telfair Square would be surprised to be told that he was not on a *street* in Savannah. We see no reason, however, why sidewalks might not be so maintained or laid, either on the idea of symmetry or to permit one on Barnard or President Street to continue in a straight line into and through the square, without effecting a change in the function of maintenance; that is to say, a park or square may be maintained in the exercise of a governmental function and yet be so arranged by design or accident that some of its parts may comport with or harmonize with adjacent territory. The contention that Barnard Street, for example, really proceeds through the square may with some show of plausibility be asserted, but an examination of the layout of the adjacent streets and the square will lead equally to a contrary conclusion. It is shown by the sketch attached to the petition that State Street runs along the northern side of the square, that York Street runs along the southern side of the square, that Barnard Street runs from the north to State Street, that a section of Barnard Street proceeds from, and after one turns into, State Street along the eastern side of the square, and that, in a similar manner, another section of Barnard Street runs along the western side of the square. Thus one passes from Barnard Street into State Street and may, by proceeding along the eastern or western side of the square, resume Barnard Street as a projection or continuation of itself on the southern side of the square, eliminating in that manner the square or, park, however *convenient* its use might be in walking along Barnard Street from north to south.

It is not shown by the petition in what manner the plaintiff entered Telfair Square. It is alleged that she was walking eastwardly, within the square, on the northeastern path in said square, which path is laid with bricks, en route to the post office. Assuming that she had come from President Street, which runs east and west, and crossed a section of Barnard Street on the western side of the square, intending to pass out of the square across the section

of Barnard Street on the eastern side of the square, and then continue eastwardly along President Street which proceeds from the section of Barnard Street on the eastern side of the square, it was not at all necessary, however convenient, that she should have passed through the square. She might have traveled around it and resumed her progress on President Street after leaving the section of Barnard Street which is on the eastern side of the square.

Nor does the allegation that the plaintiff was using the sidewalk as a thoroughfare, and was not in quest of enjoyment or recreation, but going to the post office at an unnamed location, suffice to change the accommodation of the square. Its nature is determined by its intended use, and not by the characterization which one may ascribe to it. The square could not be made a street merely because one asserts that it was being used in that capacity. It is also alleged that the sidewalks which cross the square in four directions do not belong to the square proper, but are in reality continuations of the sidewalks along the streets which meet at the square; that they were provided by the city for the convenient use of pedestrians on President Street or Barnard Street; that they conform exactly to the sidewalks of the converging streets, and that they were not laid in order that the public might enjoy them as a park, and that the allegations being taken as true on demurrer, it must be held that the maintenance of the sidewalks in the squares was in the exercise of a ministerial function. These allegations, in view of the act of 1895, are not sufficient to warrant the conclusion contended for. "A demurrer only admits such facts as are well pleaded, and where the bill alleges facts as true which are contradicted by legislative acts and records of which the court is bound to take judicial notice, it can not hold such facts to be true, and they will not prevent the sustaining of the demurrer." *Griffin* v. *Augusta & Knoxville Railroad,* 72 *Ga.* 423 (2-d). See also *Pelly* v. *Atlanta,* 40 *Ga. App.* 63 (3) (148 S. E. 747). In view of our holding that the legislature has made the maintenance of all parts of the squares of Savannah a governmental function, all of the allegations which are made for the purpose of showing that the maintenance of the sidewalks was a ministerial function are not, in the face of the act of 1895, of which all the courts take judicial cognizance, good against the general demurrer of the defendants in the present case.

In *Miller* v. *Savannah,* 33 *Ga. App.* 560 (126 S. E. 867), "Mrs.

Miller brought suit for personal injuries against the Mayor and Aldermen of the City of Savannah. She alleged in part that while crossing Forsyth Park in said city 'her toe caught in a piece of upturned cement of the sidewalk where the said cement sidewalk had been in some way broken and cracked, leaving a piece several inches long and several inches wide upturned about two inches;' that she was thrown heavily on her side and severely injured. On the trial of the case the plaintiff supported by evidence the allegations of her petition. The defendant introduced in evidence a section of the Code of the City of Savannah,—a codification of an ordinance passed in 1851,—which showed that the place where the plaintiff was injured was in certain boundaries which were 'forever set apart as a public park.' Other evidence showed that this park was still in use as such by the public; that the walk on which plaintiff was walking when she fell 'had been used for a walk since the fifties;' that the Park and Tree Commission of the City of Savannah had control, management, and maintenance of the sidewalks and pavements of the park in which she was injured, and that the cement walk on which she fell was laid in 1903." It was held that the trial court did not err in directing a verdict for the defendant, and the headnote of the case is a quotation from *Cornelisen* v. *Atlanta,* supra. Counsel for the plaintiff in error seek to distinguish that case from the present one by asserting that Forsyth Park was not of the old foundation of the city and was "forever set apart as a public park." In that case, however, it was definitely settled that liability would not attach to the city for an injury sustained on a *sidewalk* in a place "intended as a place of resort for pleasure and promotion of health of the public at large." Having concluded that the status of Telfair Square was so fixed by the act of 1895, the *Miller* case is authority for holding, as we do in the present case, that the maintenance of the sidewalk in Telfair Square was in the exercise of a governmental function, and that the court did not err in sustaining the general demurrer to the petition.

*Judgment affirmed. Stephens, P. J., concurs. Felton, J., dissents.*